Case No. 25-3149
UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

TERRI E. BAKER,
*Plaintiff-Appellant,*

v.

RANDALL WATSON, *et al.*,
*Defendants-Appellees,*

On appeal from the United States District Court
for the District of Kansas
The Honorable Judge Toby Crouse
Case No. 5:23-CV-04022-TC

OPENING BRIEF OF APPELLANT

| | |
|---|---|
| Linus L. Baker<br>6732 West 185th Terrace<br>Stilwell, Kansas 66085<br>(913) 486-3913<br>linusbaker@prodigy.net | |

*Attorney for Terri Baker*
<u>*Oral Argument is Requested*</u>

October 17, 2025

TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..........................................vii

STATEMENT OF RELATED APPEALS ..............................................viii

INTRODUCTION..................................................................................1

JURISDICTIONAL STATEMENT ..................................................3

STATEMENT OF THE ISSUES................................................................4

    Standing and Futility ..................................................................4

    Free Exercise Clause – Facial Discrimination Against Religion........4

    Unconstitutional Conditions and Pierce ...........................................5

    IDEA's Individualization Mandate .....................................................5

    Hostility to Religion ...........................................................................6

    Breadth of § 72-3463 Demonstrates Facial Unconstitutionality........6

    Equal Protection .................................................................................7

    Commissioner Watson's Dismissal....................................................7

STATEMENT OF THE CASE ...............................................................8

    A. The Parties and Procedural Posture...............................................8

    B. Kansas' School-Choice Framework for Non-Disabled Children...10

    C. Kansas' Different System for Disabled Children ........................11

        1. Private-Duty Statute and Child-Welfare Reporting...............11

        2. Religious-Activity Prohibition: K.S.A. 72-3463 .......................12

        3. Prior Restrictive Language in Handbook ................................13

    D. S.B.'s Disabilities and Educational Needs ...................................13

    E. Terri's Religious Beliefs and Educational Choices.......................14

    F. Blue Valley's Categorical Policies and Admissions ......................15

      1. BV Will "Never" Provide Services During Religious Activities ............................................................................. 15

      2. BV Will Only Design IEPs for Its Own Curriculum ............... 17

      3. Examples of BV's Religious Content Discrimination ............. 17

      4. BV's Statements Demonstrating Hostility to Religion ........... 17

      5. BV's Unilateral Unenrollment of S.B. .................................... 17

   G. S.B.'s Ongoing Deprivation of Services ........................................ 19

   H. IDEA's Requirement That IEPs Address Actual Curricula ........ 20

   I. Commissioner Watson and KSDE's Enforcement Role ................. 21

   J. The Pretrial Order's Findings of Injury ....................................... 23

   SUMMARY OF ARGUMENT ............................................................. 25

   I. Standing and Futility ..................................................................... 25

   II. Free Exercise Clause ................................................................... 25

   III. Unconstitutional Conditions and Coercion ................................. 26

   IV. IDEA and Individualization ....................................................... 26

   V. Hostility to Religion .................................................................... 27

   VI. Equal Protection ........................................................................ 28

   VII. Commissioner Watson's Enforcement Role .............................. 28

   VIII. Relief ...................................................................................... 29

STANDARD OF REVIEW .................................................................... 29

ARGUMENT ......................................................................................... 30

   I. The District Court Inverted the Constitutional Inquiry ............... 30

   A. BV's "Offer" Contains an Unconstitutional Condition ................ 30

   B. BV's Offer Is Contrary to the IDEA ............................................ 31

   C. The Supreme Court Has Rejected the "No Request, No Injury"
     Framework ...................................................................................... 32

D. The District Court's Approach Produces Circular Reasoning......33

E. Terri Does Not Need to Request What Kansas Law Prohibits....34

F. The District Court Collapsed the Merits into Standing...............35

II. K.S.A. 72-3463 FACIALLY VIOLATES THE FREE EXERCISE
       CLAUSE......................................................................................37

  A. No Compelling Interest in § 72-3463.........................................37

  B. Kansas Stands Virtually Alone Among the States.....................38

  C. The Statute Fails Strict Scrutiny...............................................39

III. KANSAS DEMONSTRATES HOSTILITY TO RELIGION.......40

  A. BV's Implementation Reveals Unconstitutional Hostility........40

  B. Masterpiece Cakeshop Standard Applies.................................41

IV. KANSAS IMPOSES UNCONSTITUTIONAL CONDITIONS ON
      PARENTAL RIGHTS...............................................................41

  A. Mahmoud Interference with Parental Choices...................41

  B. The State Creates a Coercive Choice...................................42

  C. Pierce Rights Cannot Be Conditioned.................................43

V. BLUE VALLEY VIOLATES IDEA'S INDIVIDUALIZATION
      MANDATE...............................................................................45

  A. IDEA Requires IEPs Address Actual Curricula.................45

  B. BV's Curriculum-Control Interpretation Contradicts IDEA
    .......................................................................................46

  C. This Court's Precedent Requires Actual Educational Setting
    .......................................................................................47

VI. KANSAS VIOLATES EQUAL PROTECTION..........................48

  A. Equal Protection—Creating a Disfavored Subclass............48

  B. The Classification Lacks Rational Basis.............................49

VII. THE DISTRICT COURT ERRED IN DISMISSING
    COMMISSIONER WATSON.......................................................50

    A. Watson's Official-Capacity Role and the Real Party in
    Interest........................................................................................50

    B. Kansas Law and KSDE's Website Confirm Watson
     Represents KSDE ....................................................................51

    C. Watson's Motion and the District Court's Error .................52

    D. The District Court Resolved Factual Disputes Improperly 53

CONCLUSION ....................................................................................55

ORAL ARGUMENT STATEMENT ...................................................57

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ........................58

CERTIFICATE OF DIGITAL SUBMISSION ....................................59

CERTIFICATE OF SERVICE...............................................................60

ADDENDUM .................................................................................. A-1

    Memorandum and Order July 22, 2025 ........................................ A-1

    Final Judgment........................................................................... A-11

    20 U.S.C. § 1400(d)(1)(A) ........................................................ A-12

    20 U.S.C. § 1412(a)(1) .............................................................. A-13

    20 U.S.C. § 1412(a)(10)(B) ...................................................... A-14

    34 C.F.R. § 300.199(a)(2) ......................................................... A-15

    34 C.F.R. § 300.320(a)(2)(i) ..................................................... A-16

    K.A.R. 91-40-27 ........................................................................ A-17

    K.A.R. 91-40-43. ....................................................................... A-19

    K.A.R. 91-40-48 ........................................................................ A-20

    K.S.A. 72-3120(h) ..................................................................... A-21

    K.S.A. 72-3421 .......................................................................... A-24

K.S.A. 72-3429(c).............................................. A-25

K.S.A. 72-3461(c).............................................. A-28

K.S.A. 72-3463 ................................................ A-29

K.S.A. 72-4345 ................................................ A-30

K.S.A. 75-3702a(c)............................................. A-31

Kan. Const. art. 6, § 4(a).................................... A-32

TABLE OF AUTHORITIES

Cases

*Agostini v. Felton*, 521 U.S. 203 (1997) .......................................... 7,38

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ................................................ 52

*Bd. of Educ. v. Rowley*, 458 U.S. 176 (1982) ..................................... 47

*Brown v. Montoya,* 662 F.3d 1152 (10th Cir. 2011) ........................... 53

*Carson v. Makin*, 596 U.S. 767 (2022).......... 4, 7, 24, 25, 31, 38, 43, 55

*Chiles v. Thornburgh,* 865 F.2d 1197 (10th Cir. 1989) ..................... 52

*Church of Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520 (1993) . 6, 25, 36, 38

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ... 27, 49

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013).......................... 33

*Colorado Christian Univ. v. Weaver*, 534 F.3d 1245 (10th Cir. 2008) ............................... 6, 25, 38, 55, 56

*Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836 (9th Cir. 1997) ............................................. 27, 51, 58

*Doe v. Univ. of Denver*, 952 F.3d 1182 (10th Cir. 2020) ................... 51

*Endrew F. v. Douglas Cnty. Sch. Dist.*, 580 U.S. 386 (2017) ...... 26, 45

*Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020) ................................... 4, 7, 25, 27, 38, 43, 55

*Ex parte Young*, 209 U.S. 123 (1908).......................... 7, 27, 50, 51, 52

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) ................... 27, 40

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001) .......... 6, 25

*Hafer v. Melo,* 502 U.S. 21 (1991) ..................................................... 51

*Hill v. Kemp,* 478 F.3d 1236 (10th Cir. 2007).......................................................................52

*Kentucky v. Graham,* 473 U.S. 159 (1985)...........................................................................51

*Kitchen v. Herbert,* 755 F.3d 1193 (10th Cir. 2014) ...........................52

*L.B. v. Nebo Sch. Dist.,* 379 F.3d 966 (10th Cir. 2004) 5, 26, 45, 47, 55

*Lewis v. Clarke,* 581 U.S. 155 (2017)...........................................51, 53

*Mahmoud v. Taylor,* 605 U.S. ___ (2025) ....4, 6, 25, 26, 38, 41, 43, 55, 56

*Masterpiece Cakeshop v. Colo. Civil Rights Comm'n,*
    584 U.S. 617 (2018) ...........................................6, 27, 40

*Nathan v. Alamo Heights Indep. Sch. Dist.,*
    2025 WL 5678193 (W.D. Tex. June 20, 2025) ...........................32

*Pierce v. Soc'y of Sisters,* 268 U.S. 510 (1925) ...5, 6, 26, 41, 42, 43, 55, 56

*Prairie Band Potawatomi Nation v. Wagnon,*
    476 F.3d 818 (10th Cir. 2007) ...........................................52

*Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819 (1995)
    .........................................................................16,25

*Sanchez v. Guzman,* 105 F.4th 1285 (10th Cir. 2024) ......................29

*Sherbert v. Verner,* 374 U.S. 398 (1963) ...............................26, 42

*Susan B. Anthony List v. Driehaus,* 573 U.S. 149 (2014) ..........24, 31

*Thompson R2-J Sch. Dist. v. Luke P.,*
    540 F.3d 1143 (10th Cir. 2008) .................................5, 45, 47, 55

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*

582 U.S. 449 (2017) ..........................4, 7, 24, 31, 38, 43, 55, 56, 58

*Troxel v. Granville*, 530 U.S. 57 (2000) ............................................ 26

*United States v. Supreme Court of New Mexico*,

    839 F.3d 888 (10th Cir. 2016) .................................................... 29

*U.S.D. No. 443 v. Kansas State Bd. of Educ.*, 266 Kan. 75 (1998) ... 51

*Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635 (2002) ..... 52,53

*Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1 (1993) ............. 20

## Constitutional Provisions

U.S. Const. amend. I (Free Exercise Clause) ................... 4, 24, 25, 36

U.S. Const. amend. XIV (Equal Protection Clause) ...................... 7,48

## Statutes and Regulations

20 U.S.C. § 1400(d)(1)(A) .............................................................. 1,58

20 U.S.C. § 1412(a)(1) .................................................................. 1,58

20 U.S.C. § 1412(a)(10)(B) ........................................................... 1,58

28 U.S.C. § 1291 .................................................................................. 3

34 C.F.R. § 300.199(a)(2) .................................................................. 20

34 C.F.R. § 300.320(a)(2)(i) ..................................................... 5, 19, 45

34 C.F.R. § 300.320(a)(4)(i)–(ii) ....................................................... 19

34 C.F.R. §§ 300.130–144 ............................................................ 36,47

K.A.R. 91-40-27 ................................................................................ 19

K.A.R. 91-40-43 ................................................................................ 20

K.A.R. 91-40-48 ...................................................... 7, 12, 20, 27, 51

K.S.A. 72-3120(h) .............................................................................. 10

K.S.A. 72-3421 ................................................................... 11, 21, 42

K.S.A. 72-3429(c)(2) .......................................................................... 19

K.S.A. 72-3461(c) .................................................................. 10

K.S.A. 72-3463 ............................ 1, 4, 6, 12, 24, 25, 29, 36, 38, 51, 58

K.S.A. 72-4345 ..................................................................... 10

K.S.A. 75-3702a(c) ................................................................ 51

Kan. Const. art. 6, § 4(a) ..................................................... 51

Other Authorities

Nicole Stella Garnett, Unlocking the Potential of Private-School
Choice, Manhattan Institute Policy Report 8 (Mar. 2023),
https://shorturl.at/iBJVY .................................................. 1

**CORPORATE DISCLOSURE STATEMENT**

Consistent with Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant Terri Baker, Baumgarten Academy is not a corporation. Heritage House is a 501(3)(c) organization  and that it neither issues stock nor has a parent  corporation

**STATEMENT OF RELATED APPEALS**

There are no related appeals.

**INTRODUCTION**

This case concerns control – who determines the curriculum of a disabled child in Kansas: the parent or the State. Kansas law promises educational freedom to every family, yet that promise disappears the moment a child needs special education. For families like Terri Baker's, the State has made the exercise of faith the price of accessing the "free" education that Congress guaranteed to all children with disabilities.

Under *K.S.A. 72-3463*, no special-education service may be provided "in connection with any religious activity." That single sentence turns Kansas into an outlier among the States. No other state forbids what § 72-3463 forbids. Federal law – 20 U.S.C. § 1412(a)(1) and § 1412(a)(10)(B) – expressly allows states to deliver IDEA services in both private and religious schools. Kansas alone adds a "private-duty" clause that converts the *free* in FAPE into a personal and permanent financial burden.

When a Kansas parent leaves the public-school system for reasons of conscience or curriculum, the "free" services do not end – they become the parent's bill. What Congress framed as choice, Kansas converts into punishment. Terri Baker cannot walk away from the government's IEP

1

without assuming its cost. Once a family enters the IEP system, escape depends on the public-school team's permission. It is a one-way gate that binds parental liberty to the State's curriculum, sending an unmistakable message: *go your own way if you must, but carry this heavy "Egypt-curriculum" anchor on your neck.*

That is not equality of school choice; it is coercion by design. In Kansas the government always wins – either the parent accepts a secular IEP built for a public-school curriculum or pays privately for what federal law provides for free. No other state operates this way. The only path to the "free" benefit runs through a Blaine-era no-aid clause that disables services whenever religion appears.

The consequences are concrete. Students with disabilities are among those least served by rigid district systems. *See* Nicole Stella Garnett, *Unlocking the Potential of Private-School Choice*, Manhattan Inst. Policy Rep. 8 (Mar. 2023), https://shorturl.at/iBJVY ("students with disabilities" are chief among the "children who are not well served by district public schools"). The IDEA's purpose is to meet each child's "unique needs" through individualized instruction. 20 U.S.C. § 1400(d)(1)(A). S.B. exemplifies the failure: Blue Valley refuses to design

an IEP that meets his religious educational needs because § 72-3463 forbids it. Terri Baker cannot even compete for those services unless she renounces religious instruction. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017) ("The express discrimination against religious exercise here is …the refusal to allow [a religious applicant] … to compete with secular organizations for [a public benefit].").

Kansas has thus built a system that is systemically unconstitutional from start to finish – from IEP creation to the delivery of services. It singles out religion for special disabilities, punishes parents for exercising faith, and subordinates family autonomy to state orthodoxy. This appeal seeks to dismantle that coercive regime and to restore what the Constitution and Congress both promised: a genuinely *free* appropriate public education, not one conditioned on the surrender of conscience.

**JURISDICTIONAL STATEMENT**

This Court has jurisdiction under 28 U.S.C. § 1291 because the district court entered final judgment on August 20, 2025, and Plaintiffs timely filed their appeal notice on August 20, 2025. AA 6-150.[1]

---

[1]Citations to the Appellant's Appendix are designated as "AA Vol. #" (e.g., AA Vol. 6 at 150 refers to Volume 6, page 150). The Appellant's Appendix contains six volumes..

## STATEMENT OF THE ISSUES

### STANDING AND FUTILITY

Whether the district court erred in holding that Appellants lacked standing to challenge K.S.A. 72-3463 where: (1) the statute categorically prohibits services during religious activities, (2) Blue Valley admits it will "never" provide such services, (3) Kansas law imposes a non-discretionary duty on districts to provide IEP services, and (4) Appellants have suffered concrete injuries including financial costs, educational deprivation, and coerced curriculum choices.

### FREE EXERCISE CLAUSE – FACIAL DISCRIMINATION AGAINST RELIGION

Whether K.S.A. 72-3463 facially violates the Free Exercise Clause by categorically excluding IDEA services during religious instruction, in conflict with *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017), *Espinoza v. Montana Department of Revenue*, 591 U.S. 464 (2020), *Carson v. Makin*, 596 U.S. 767 (2022), and *Mahmoud v. Taylor*, 605 U.S. ___ (2024).

### UNCONSTITUTIONAL CONDITIONS AND *PIERCE*

Whether Kansas unconstitutionally conditions IDEA services on parents' surrender of curriculum control, forcing parents to choose

between religious education and federally mandated services, in violation of *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), and the unconstitutional conditions doctrine.

### IDEA'S INDIVIDUALIZATION MANDATE

Whether Blue Valley's policy of designing IEPs only for its own curriculum – rather than for children's actual curricula – violates IDEA's requirement that IEPs enable progress in "the general education curriculum," 34 C.F.R. § 300.320(a)(2)(i), and this Court's holdings in *L.B. v. Nebo School District*, 379 F.3d 966 (10th Cir. 2004), and T*hompson R2-J School District v. Luke P.*, 540 F.3d 1143 (10th Cir. 2008).

### HOSTILITY TO RELIGION

Whether Blue Valley's implementation of K.S.A. 72-3463 demonstrates unconstitutional hostility toward religion by: (1) declaring S.B. does not "need" religious materials for reading instruction, (2) claiming authority to interpret Terri's religious beliefs, (3) admitting it teaches ideologies "but not of the religious kind," and (4) asserting that providing neutral services during religious activities would "infuse" religious teaching into therapy – conduct condemned in

*Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 584 U.S. 617 (2018).

**THE BREADTH OF § 72-3463 DEMONSTRATES FACIAL UNCONSTITUTIONALITY**

Kansas's statute does far more than prohibit services during formal worship. Its text forbids any service "in connection with any religious course, devotional exercise, religious training, or any other religious activity." Each clause adds a separate layer of religious exclusion, together forming a comprehensive bar to participation.

- **"RELIGIOUS COURSE."**

This clause prohibits services whenever the instruction itself contains religious content. A speech therapist could not assist a child reading from a Bible passage or working on a faith-based writing exercise. That is classic viewpoint discrimination forbidden by *Rosenberger v. Rector*, 515 U.S. 819 (1995), and *Good News Club v. Milford Central School*, 533 U.S. 98 (2001).

- **"DEVOTIONAL EXERCISE"**

This forbids assistance whenever prayer or worship occurs. The government thus withdraws benefits because of the religious character

of the activity, violating *Church of Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520 (1993).

- "**RELIGIOUS TRAINING**"

This phrase is unconstitutionally vague and invites entanglement, forcing officials to decide what constitutes "training." Is moral formation or religious music "training"? *Colorado Christian* rejected precisely this kind of theological line-drawing.

- "**ANY OTHER RELIGIOUS ACTIVITY**"

The catch-all clause has no limiting principle. It sweeps in every faith-integrated lesson or setting, effectively excluding all children educated in religious environments. Such overbreadth operates as a total ban on religious use and violates *Carson v. Makin*, 142 S. Ct. 1987 (2022), *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020), and *Trinity Lutheran Church v. Comer*, 582 U.S. 449 (2017).

Because "special education and related services" encompass the full range of instruction and therapy under IDEA, § 72-3463 functions as a systemic exclusion from participation for every religious student. It compels parents to secularize their child's education before a therapist

can appear, transforming a federal benefit into a coercive condition on faith.

Each clause therefore triggers strict scrutiny independently, and together they reveal that § 72-3463 is facially unconstitutional under the Free Exercise Clause, the Establishment Clause's non-entanglement principle, and the IDEA's mandate of individualized neutrality. *See also Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1 (1993); *Agostini v. Felton*, 521 U.S. 203 (1997).*

EQUAL PROTECTION

Whether Kansas's system violates equal protection by granting non-disabled children full curriculum autonomy through school choice laws while conditioning disabled children's access to services on acceptance of the district's secular curriculum, creating an irrational classification based on disability status without legitimate justification.

COMMISSIONER WATSON'S DISMISSAL

Whether the district court erred in dismissing Commissioner Randall Watson where: (1) he is sued in his official capacity as chief administrative officer of the Kansas State Department of Education,

(2) KSDE promulgates and enforces K.A.R. 91-40-48 and the "private duty" regulation, (3) KSDE publishes and distributes the Special Education Process Handbook that Blue Valley follows to implement K.S.A. 72-3463, and (4) the district court improperly applied an individual-capacity personal-participation standard to an official-capacity suit under *Ex parte Young*, 209 U.S. 123 (1908).

STATEMENT OF THE CASE

A. **THE PARTIES AND PROCEDURAL POSTURE**

An Amended Complaint was filed against Randall D. Watson, Kansas Commissioner of Education, in his official capacity; and Mark Schmidt, in his official capacity, as special needs administrator for Blue Valley Unified School District ("BV"). AA 1-28. Terri Baker and her son S.B. reside in the BV school district. AA 2-132 (p.6:5-10). BV filed a motion for summary judgment against the plaintiff which the plaintiff opposed. AA 6-84. The plaintiff filed a motion for summary judgment against BV. AA 6-4.

On June 23, 2024, Watson moved to dismiss with memorandum. AA 1-244. In Watson's memorandum he said that Plaintiffs "fail to allege any specific act or omission by Commissioner Watson that caused their

alleged injury" and that "mere reference to his title does not convert conclusory allegations into plausible facts." AA 2-251. Watson said that "Plaintiffs have not alleged that Watson personally participated in any decision regarding S.B. or denied any benefit to them," and that "official capacity does not shield Plaintiffs from the requirement to show personal involvement." *Id.* The plaintiff moved on May 31, 2024, for summary judgment against Watson. AA 1-207.

The lower court granted Watson's motion to dismiss and BV's Motion for Judgment. AA 3-103. In its June 25, 2024 Memorandum (AA 3-103), the district court granted Watson's motion to dismiss and acknowledged that Terri alleged an injury-in-fact – denial of special education benefits by BV – but held that she "cannot trace her injury to Watson," because she identified only his "abstract authority to supervise schools" and could not show "that he has done so in this case and in a way that has injured Baker." AA 6-128.

The lower court entered a pretrial order on November 13, 2024. AA 3-126. The Pretrial Order set out the legal counts all demonstrating injuries to S.B. and Terri. AA 1-128-29. The lower court denied the plaintiff's summary judgment motion and granted BV's motion. (AA 6-

139 stating she "failed to affirmatively state what her injury was" and that her allegations were "cursory and conclusory." AA 6-146. The lower court held that Terri never made a formal request for services during religious activities or a religious setting and therefore the failure of S.B. to obtain special needs services stemmed from Terri's own choices. AA 6-154. The lower court stated that Terri never requested that BV provide S.B. with special education services at his current non-BV school... and nor has she ever requested that BV provide S.B. with any religious instruction.... AA 6-147.

B. **KANSAS' SCHOOL CHOICE FRAMEWORK FOR NON-DISABLED CHILDREN**

Kansas provides parents of school-age children what is called "school choice" permitting parents to comply with Kansas' compulsory education statutes by allowing school aged children to be enrolled in accredited or nonaccredited private elementary or secondary schools. AA 3-259; AA 3-258 (Kansas Education Handbook) (p. 117); K.S.A. 72-4345; AA 4-136 (Kansas House Bill No. 2567).

According to Watson's Handbook, K.S.A. 72-3461(c) requires private schools for special education services to be an organization which regularly offers education at the elementary or secondary level, which is

exempt from federal income taxation under section 501 of the federal internal revenue code....Accordingly, a home school may be a private school for special education purposes, but only if it meets the definition of a private school in K.S.A. 72-3461(c)." AA 3-259; AA 3-258 (p. 117); AA 2-97.

The Handbook states that "because Kansas homeschools meet the definition in K.S.A. 72-4345 as a 'Nonaccredited private school,' they meet the requirement (A) in K.S.A. 72-3120(h). ...the school district of residence must accept the child on a part-time basis to attend any of its courses, programs or services, including special education services specified in a child's IEP." AA 3-258 (p.117).

Pursuant to HB 2567, S.B. is currently enrolled part time in BV for the 2024-2025 school year. AA 1-289 (Ex. 6) (ParentVue Webpage). Under HB 2567 each board of education of a school district shall allow any child to enroll part-time in the school. AA 5-74 (p.20).

C. **KANSAS' DIFFERENT SYSTEM FOR DISABLED CHILDREN**

1. **THE PRIVATE DUTY STATUTE AND CHILD WELFARE REPORTING**

The Handbook states "it is the duty of the parent of a child with a disability (does not included gifted) to require their child to attend school

to receive the special education and related services in the child's IEP or the parent must provide such services privately (K.S.A. 72-3421). This requirement is in addition to and goes beyond the standard Kansas compulsory attendance statute at K.S.A. 72-3120." AA 3-258.

The Handbook states that if a school district is aware that an eligible child is not receiving services due to the parents' refusal to provide or accept the needed services, the school must determine if it is necessary to report the child as a child in need of care as a result of truancy to DCF. AA 3-258 (p.117).

The Handbook states that "the law requires parents to see that their child with the disability, not giftedness, attend school so that their child can receive the special education and related services on the child's IEP or to provide such services privately." AA 2-247 (p.101:5-11). Kansas requires the exceptional child that has an IEP to receive services if the parent does not withdraw consent. AA 2-248 (p.104:8-14).

Kansas non-accredited private schools must follow the Board of Education's regulations set forth by law. AA 2-231 (p.35:19-25). In KSDE Handbook, Chapter 1, it states that special education statutes "sets forth parental responsibilities. This law requires parents to see that their child

with a disability (not giftedness) attends school so that their child can receive the special education and related services on the child's IEP, or to provide such services privately." AA 3-151 (p.10); AA 2-247 (p.100:22-p.101:15).

A parent may not revoke consent for the continued provision of a particular service or placement unless the child's IEP team certifies in writing that the child does not need a particular service or placement for which consent is being revoked in order to receive a free public education. AA 3-163 (p.22), AA 3-188; AA 2-270 (p.191:10-25).

An exceptional child in the state of Kansas is always entitled to the services that are designated in the child's IEP when his parent has not withdrawn consent for the services. AA 2-265 (p.171:15-24); AA 2-266 (p.174:10-p.175:7). An exceptional student's IEP continues to exist irrespective of whether that child is enrolled in a public or private school. AA 2-257 (p.141:1-5).

2. The Religious Activity Prohibition: K.S.A. 72-3463

K.S.A. 72-3463 states that "no special education services shall be provided in connection with religious courses, devotional exercises, religious training or any other religious activity."

Under K.A.R. 91-40-48, KDSE requires each agency to "ensure that special education and related services provided to exceptional children enrolled in private schools are provided in a secular and nonideological manner."  AA 4-81

BV enforces Chapter 14 of the Handbook which contains the language "no special education services shall be provided in connection with religious courses, devotional exercises, religious training or any other religious activity." AA 5-98 (p.216:23-p.218:2). Chapter 14 of the Handbook states that "State law allows for services to be provided at either the public or private school, but forbids the provision of special education and related services 'in connection with religious courses, devotional exercises, religious training, or any other religious activity.'" AA 3-258; AA 6-51 (39).

BV enforces K.A.R. 91-40-48's requirement that "special education and related services provided to exceptional children enrolled in private schools are provided in a secular and nonideological manner." AA 5-78 (p.134:14-p.135:18).

3. PRIOR RESTRICTIVE LANGUAGE IN HANDBOOK (BEFORE HB 2567)

Prior to Kansas House Bill No. 2567 being enacted, the Handbook stated that "Public schools are also not required to permit part-time enrollment of home schooled children for purposes of receiving special education and related services." AA 2-105 (p.12). The Handbook stated that "public schools are not required to provide special education and related services for home-schooled children" even though Kansas now provides for dual or part-time enrollment. AA 2-105 (p.12); AA 2-251 (p.114:17-p.117:9).

D. **S.B.'S DISABILITIES AND EDUCATIONAL NEEDS**

S.B. is diagnosed with dyslexia and Dysgraphia and has long had an Individualized Education Program (IEP). AA 4-195 p.35:21-p.39:15; 5; AA 4-201 (p.58:19-p.61:25). S.B. was diagnosed with Dyslexia and Dysgraphia by the Jordan Psychological Assessment Center. AA 4-201 (p.58:19-p.61:25). Dr. Brooke was paid $3,040.00 to assess S.B.'s cognitive, academic, attention, social/ emotional, and/or behavioral functioning using standardized measures of the appropriate domains and using tests appropriate for the child's age and level of functioning. AA 5-44. After her assessments, Dr. Carson provided a 34 page written report on February 22, 2023. AA 5-10.

In her memorandum it alleged "S.B., Terri's son, has an educational need to learn about God and the Christian Gospel of Jesus Christ as the Messiah for all mankind." AA 6-4. It cited the sworn statement of Terri, AA 1-275; Terri's deposition AA 2-131; AA 4-135, p.22:17-18; p.23:1-18; p.24:1-19; p.28:12-24; p.49:17-p.50:12).

E. **TERRI'S RELIGIOUS BELIEFS AND EDUCATIONAL CHOICES**

Terri is a Christian and has attended Bible School. AA 2-136 (p.22:17-18): AA 2-134 (p.15:19-23). Terri's religious faith affects her parenting of S.B. AA 2-136 (p.23:16-p.26:9). S.B. has attended Whitefield Christian Academy and Terri unsuccessfully attempted to later enroll S.B. in other Christian schools. AA 2-146 (p.62:12-p.66:7). Because S.B. had dyslexia it made it difficult to get S.B. enrolled in a private Christian school. AA 2-147 (p.68:8-13).

When asked what was wrong with BV Terri said "the environment" and that it was "godless." AA 2-147 (p.68:11-23). S.B. has been and continues to be enrolled in a registered non-accredited private school called Heritage House. AA 2-152 (p.89:4-8); AA 2-155 (p.99:12-19); AA 2-156 (p.102:19-22).

Terri has consented to the initiation of special needs services for S.B. and has never revoked consent for any of those services. AA 5-4 (Terri Sworn Statement); (Ex. 7, ¶¶6-7); AA 5-4 (¶16); AA 4-187 (T. Dep) AA 4-141 (p.30:7-13); AA 4-152 (p.86:17-24); AA 4-156 (p.89:4-16). Terri has no experience with special education services. AA 4-139 (p.21:19-24). Terri is unable to teach S.B. special education at her home school. AA 4-156 (p.89:1-17). S.B. enrolled by Terri in BV to comply with the Handbook requirements that she has a duty to S.B. that he be provided FAPE and special needs services. AA 1-275 (¶ 8).

F. **BLUE VALLEY'S CATEGORICAL POLICIES AND ADMISSIONS**

1. **BV WILL "NEVER" PROVIDE SERVICES DURING RELIGIOUS ACTIVITIES**

BV has provided special needs services to students at their home residence or at other buildings which are not BV buildings. AA 2-188 (p.89:6-25). BV will not provide special needs services in connection with any religious activities of the student even when providing them outside of BV buildings. AA 2-188 (p.90:3-8).

Special needs services will not be provided to S.B. by BV during religious activities or his religious curriculum which is what Terri wants. AA 2-164 (p.134:14-23); p.135:7-16. Terri would accept special services

provided by BV in S.B.'s religious curriculum. AA 2-164 (p.135:7-16). Terri wanted S.B. to have push in special need services in S.B.'s private school general education curriculum. AA 2-149 (p.74:18-23); AA 2-150 (p.78:9-13-25); AA 2-153 (p.92:24-p.93:24).

In order for BV to provide S.B. special needs services, it has to be on BV's terms. AA 2-164 (p.134:14-23).

BV will never provide push-in services for S.B. even when BV places S.B. in a private school placement. AA 2-179 (p.56:2-23). BV will not provide any push-in special needs services for S.B. in his non-accredited private school. AA 2-179 (p.56:9-p.57:20); AA 2-180 (p.59:21); AA 2-200 (p.138:22-p.139:2).

BV says it must follow the KSDE regulation and will not provide S.B. any special needs services while S.B. is learning using these kinds of faith-based books. AA 2-219-20 (p.216:23-p.218:2); AA 2-179 (p.56:9-p.57:20); AA 2-180 (p.59:21); AA 2-200 (p.138:22-p.139:2); AA 2-216 (p.216:23-p.218:2); AA 2-202 (p.145:2-6).

2. **BV WILL ONLY DESIGN IEPS FOR ITS OWN CURRICULUM**

S.B. must be enrolled in BV to receive his FAPE from BV. AA 2-138 (p. 31:1-6; p.32:10-18); AA 2-200 (p.139:13-23); AA 2-211 (p.182:10-23).

S.B. is entitled to receive special needs services from BV but in order for S.B. to receive those special needs services from BV, S.B. must first be enrolled in the BV school district. 2-175 (Ex. 9), p.40:22-p.41:17; p.43:7-15. In order for S.B. to attend BV classes, S.B. must first be enrolled with BV school district. AA 2-177 (p.45:3-19).

Despite Kansas providing for school choice, BV states S.B. must be enrolled at BV and obtain an IEP only designed to make progress in BV's general education curriculum. AA 2-253-54 (p.122:1-12; p.123:7-19; p.125:9-17); p.126:8-12.

BV will not design S.B.'s IEP to meet his "other educational needs" if those educational needs involve religion. AA 2-198 (p.132:10-15).

S.B.'s IEP could assist S.B. in memorization utilizing music but BV will not develop an IEP using music of a Biblical Hymn or Biblical verse. AA AA 2-199 (p.134:1-24).

BV will not provide any special needs services to S.B. in S.B.'s non-secular general education curriculum because of K.A.R. 91-40-48 and K.S.A. 72-3463. AA 2-219 (p.216:23-p.218:2); AA 2-202 (p.145:2-6).

3. **EXAMPLES OF BV'S RELIGIOUS CONTENT DISCRIMINATION**

Even if S.B.'s special education teacher thought S.B. singing "Joy to the World the Lord has Come Let Earth Receive Her King" would help S.B. it would not be permitted by BV because it's a "religious song." AA 2-179 (p.53:1-25).

BV would not permit its special education teacher to initiate having S.B. in drawing "three kings on their way to see baby Jesus" even if the special needs teacher thought it would help S.B. learn. AA 2-180 (p.57:4-15). If S.B. initiated the drawing the special needs teacher could assist because it wasn't a "religious activity." AA 2-180 (p.57:16-18).

BV will not provide special education services in connection with religious activities but that determining whether an activity was religious was "outside my expertise" and that he doesn't know. A 2-180 (p.58:1-19).

4. **BV'S STATEMENTS DEMONSTRATING HOSTILITY TO RELIGION**

In opposition, BV did not merely decline to provide services in religious settings -- it affirmatively declared that S.B. does not need to use religious materials for reading skills. AA 6-77 (p.34). Terri's description of its environment as "godless" was described by BV a "term

of derision rather than a statement of religious belief," claiming to know Terri's beliefs better than she does. AA 6-83 (p.40).

Regarding the "nonideological manner" requirement, BV does teach ideologies but not of the religious kind. AA 2-182-3 (p.66:11-p.68:2).

5. **BV's UNILATERAL UNENROLLMENT OF S.B.**

BV has un-enrolled S.B. without the knowledge or consent of S.B.'s parents. AA 2-162(p.127:21-128-1); p.128:4-8); p.128:20-p.129-20. Terri made numerous requests to the BV School District to enroll S.B. in the BV School District through the ParentVue parent website. AA 2-162-68 (p.128:20-p.129:20). Terri successfully enrolled S.B. through ParentVue in the past. AA 2-162 (p.128:20-p.129:20). After Terri completed the ParentVue registration, BV did not contact Terri to explain why it would not enroll or re-enroll S.B. AA 2-163 (p.129:17-20).

When BV un-enrolled S.B. it changed S.B.'s access to his special education services. AA 2-207 (p.165:4-21). One of the reasons Terri has attempted to enroll S.B. in the BV school district is so that S.B. can obtain free services from BV. AA 2-162 (p.127:21-p.128:1). This was Terri's attempt to obtain S.B.s education and special services from BV for S.B. AA 2-162 (p.128:4-8).

Terri's understanding is that S.B. needed to be enrolled at BV in order to get services or be tested but that BV would not enroll S.B. AA 2-146 (p.81:13-p.82:14); AA 2-152 (p.86:17-21); AA 2-153 (p.90:6-10); AA 2-218 (p.211:1-p.215:4); (p.216:2-21).

Terri did not agree to the statement that "BV hasn't done anything to stop you from obtaining special education services at a school of your choosing." AA 2-153 (p.90:1-5).

G. **S.B.'S ONGOING DEPRIVATION OF SERVICES**

S.B. has not received the special education and related services designated in his IEP of which BV is aware of this fact. AA 2-138 (Terri Dep) (Ex. 5, p.30:7-13); AA 2-152 (p.86:17-24); AA 2-153 (p.89:4-16); AA 2-153 (p.90:1-10).

Schmidt stated that Terri was not qualified to provide related services to S.B. such as occupational therapist services. AA 2-148 (p.69:18-p.70:25).

H. **IDEA'S REQUIREMENT THAT IEPS ADDRESS ACTUAL CURRICULA**

Special Educations services to the exceptional child under the student's IEP should assist the child to make progress in the general

education curriculum regardless of where the services are provided. AA 2-260 (p.152:13-16).

General education curriculums that are in sectarian or religious private schools are different than what exist in a similar general education curriculum in the public school. AA 2-258 (p.144:17-23). A child's IEP is supposed to help the student make progress in their general education curriculum. AA 2-258 (p.143:21-24). All schools have different general education curriculums. AA 2-258 (p. 143:25-p.144:2).

Whether a child is enrolled in a private or a public school the IEP should help that child make progress in that particular general education curriculum. AA 2-258 (p.144:3-15). Parents choose private schools so they can have religious kinds of instructions integrated in the general education curriculum. AA 2-258 (p.144:24-p.145:5).

A private sectarian school has a general education curriculum which a parent can go to the school IEP team and ask for an IEP to make progress in that school's curriculum. AA 2-260 (p. 152:22-p.153:7). The IEP team is supposed to try and develop and IEP so that the exceptional child can make progress in the general education curriculum of the private sectarian school. AA 2-260 (p.153:4-7).

BV can re-evaluate S.B.'s IEP without parental consent if it has made a reasonable effort. AA 3-157 (p.16) (citing K.A.R.91-40-27). Schmidt interprets the Handbook as obviating BV's obligation to re-evaluate S.B. at all. AA 2-204 (p.153:4-p.154:4; p.155:6-p.156:4).

Every IEP must contain annual goals which are to "enable the child to be involved in and make progress in the general education curriculum." 34 C.F.R. § 300.320(a)(2)(i); 34 C.F.R. § 300.320(a)(4)(i)-(ii) (IEP must include a statement [of services] "that are designed to enable the child to advance appropriately toward attaining the annual goals and to be involved in and make progress in the general education curriculum"); K.S.A. 72-3429(c)(2) ("make progress in the general education or advanced curriculum").

BV does provide special education and related services to exceptional children enrolled in private schools. AA 2-182 (p.68:12-17). Schmidt knows the Handbook does not permit BV to provide S.B. services when they are connected to S.B.'s religious instruction. AA 2-178 (p.51:2-5).

I. **COMMISSIONER WATSON AND KSDE'S ENFORCEMENT ROLE**

Randall D. Watson is the Commissioner of Education. AA 2-225 (Watson Dep) (Ex. 10), AA 2-224 (p.7:11-24). Watson represents the State Board of Education and has general oversight of this agency and education functions that align with the Kansas constitution. AA 2-225 (p.10:22-24) (p.6:17-23).

Watson's office "has the ultimate responsibility for the entire agency and directly oversees those agency functions that provide services to the entire agency." AA 2-224 (p.7:11-24). Watson oversees the Division of Learning Services has oversight over Special Education and Title Services. AA 2-224 (p.8:15-20).

Watson has enforcement and implementation obligations regarding the State Board of Education regulations. AA 2-225 (p.10:1-7); AA 2-226 (p.14:3-p.15:14). Under K.A.R. 91-40-43, Commissioner is required to implement and enforce this 91-40-43 which requires school boards to provide special needs services to exceptional children residing in the school board's district. K.A.R. 91-40-43.

Watson is responsible for overseeing the certification and renewal of nonpublic schools. AA 1-287-8. Watson is the Chief Administrative Officer for KSDE. AA 1-287-8. KSDE is required by 34 CFR

§300.199(a)(2) to identify in writing to [BV] the LEAs located in the State and to the Secretary that such rule, regulation, or policy is a State imposed requirement, which is not required by Part B of the Act or the Federal regulations.

Watson "has ultimate responsibility for the entire agency and directly oversees those agency functions that provide services to the entire agency, including Communications, Legal Services, Human Resources and Recognition Programs. The Office of the Commissioner provides leadership to schools and the State Board of Education in complying with all state and federal laws, regulations and requirements." AA 1-290.

Watson's Division of Learning Services "provide consultative services for general and special education programs for disadvantaged….AA 1-292. KSDE is charged with overseeing the implementation and interpretation of Kansas state law that makes up Kansas's IDEA state plan, including the certification of nonpublic schools and the distribution of federal IDEA funds and state special education funds to LEAs. AA 1-292.

Under KSDE regulations, it deems homeschools as "non-accredited private Schools." Those homeschools are not required to meet any of the K.S.A. 72-3461 private school requirements applicable to exceptional children. AA 2-93-5. Under K.S.A. 72-3461, it defines a "private school" as "an organization which regularly offers education at the elementary or secondary level, which is exempt from federal income taxation...." Thus, parents, schools, and exceptional students are arbitrarily treated differently and exceptional children are not permitted to attend the same kind of homeschools as other non-exceptional children are.

KSDE publishes a "Special Education Process Handbook" which it states the "Kansas Special Education Process Handbook was developed as a guidance document by the Kansas State Department of Education." On KSDE's website (https://tinyurl.com/23hchz2n) KSDE states it publishes a Handbook to "provide guidance, resources and supports necessary for those professionals who work to improve results for exceptional children. The information provided in the Kansas Special Education Process Handbook attempts to clarify and define legal requirements of the law and regulations. AA 3-143.

The BV website links the Kansas Special Education Process Handbook. AA 2-168 (p.10:14-22). Watson has registered Baumgarten Academy and Heritage House as non-accredited schools. AA 2-108-9. Kansas recognizes only two categories of schools: accredited and non-accredited schools. AA 2-93; K.S.A. 72-4345. In Watson's Special Education Handbook it states that "all homeschools are non-accredited schools in Kansas" and "must follow the regulations set forth by law." AA 2-231 (p.35:11-25).

Watson office has jurisdiction over the exceptional child who is a student when enrolled in a non-accredited private school. AA 2-236 (p.54:19-23). As Commissioner he would be tasked with enforcing providing services to exceptional children enrolled in private schools. AA 2-236 (p.80:7-19).

The Commissioner has ongoing jurisdiction over the exceptional child if the child is enrolled in a non-accredited private school. AA 2-236 (Watson Dep) Ex. 10 p.54:19-23.

KSDE has published a "Dyslexia Handbook" AA 4-88.

Schmidt is the Assistant Superintendent of Special Education for the BV. AA 2-167 (p.6:21-25; AA 2-167 (p.9:7-23). Schmidt was familiar

with the Kansas regulations on special education as "mainly as interpreted through the process handbook." AA 2-166 (Schmidt Dep) AA 2-177 (p.48:1-5); AA 2-182 (p.65:24-p.66:10).

## J. THE PRETRIAL ORDER'S FINDINGS OF INJURY

The facts in the Pretrial Order demonstrated another injury to S.B.: denied access to IEP services in his chosen religious curriculum, unlike peers in secular settings; as to Terri it forced her to secularize S.B.'s education or forego IDEA benefits, placing her in a coercive "either/or" position and his speech/learning support cannot be delivered in a way that integrates with his religious instruction; Terri was required to adopt secularized content as a condition of receiving any IDEA services, chilling her right to direct her child's education consistent with her faith. AA 3-134.

The pretrial facts supporting those claims showed injury to S.B. being treated unequally compared to children in secular private schools, who can receive IEP services in their chosen curricular context. AA 3-128.

Last, the pretrial order stated injuries to S.B. being unilaterally unenrolled, denied part time enrollment, and refused access to IEP

services. Id. Likewise Terri was deprived of procedural protections (no notice, no hearing) and forced into the position of privately funding services while still legally bound by Kansas' parental duty statue (K.S.A. 72-3421. AA 3-128-29.

As to Count VII, both the hearing officer and ALJ said they lacked jurisdiction to address constitutional claims made by the plaintiffs. AA 1-112. The district court likewise disclaimed jurisdiction, stating it could not go beyond the "sufficiency" dismissal. AA 3-125.

The lower court treated "offered services" as though they were unconditional and fully compliant with the Constitution and the IDEA, not addressing K.S.A. 72-3463 which Terri characterized as a "poison pill." AA 1-265; 3-90; 6-91; AA 6-116. The lower court equated delivering "IEP services" as "secular" the same as not delivering them "in connection with religious courses…." AA 6-141.

This case is about who controls the curriculum of a disabled child in Kansas – the parent or the State. Kansas grants educational freedom to every family except those with disabled children. For them, the State converts the "free" in FAPE into a private financial duty. Once a parent accepts an IEP, she may not exit without the government school's permission. If she leaves for religious or curriculum reasons, Kansas law declares her responsible for all special-education services at her own expense. That coercive structure forces religious families to secularize their education to participate in a government program – precisely the constitutional violation the Free Exercise Clause forbids.

## I. STANDING AND FUTILITY

Terri Baker suffered injury the moment Kansas barred her from equal participation. *Trinity Lutheran Church of Columbia v. Comer*, 582 U.S. 449 (2017), and *Carson v. Makin*, make clear that exclusion from a benefit on account of religion is a cognizable injury; plaintiffs need not "apply to be denied." The district court inverted that principle. Blue Valley admitted that it would "never" provide services in a religious setting, making any application futile. That categorical exclusion is not a

factual dispute – it is a jurisdictional injury in law, recognized by the Supreme Court and confirmed by *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014). Futility doctrine exists precisely to prevent citizens from enduring empty gestures before vindicating constitutional rights.

## II. FREE EXERCISE CLAUSE

K.S.A. § 72-3463 is a facially discriminatory statute. It forbids services "in connection with any religious course, devotional exercise, religious training, or any other religious activity." Together these prohibitions exclude religious education in every form, making participation contingent on secularization.

First, the prohibition on "religious courses" is viewpoint discrimination. *Rosenberger v. Rector*, 515 U.S. 819 (1995); *Good News Club v. Milford Central School*, 533 U.S. 98 (2001).

Second, banning services during "devotional exercises" targets religious conduct directly. *Church of Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520 (1993).

Third, "religious training" is vague and entangling, compelling officials to decide what counts as religious instruction – a theological

inquiry the Tenth Circuit condemned in Colorado *Christian Univ. v. Weaver*, 534 F.3d 1245 (10th Cir. 2008).

Finally, the catch-all phrase "any other religious activity" eliminates all limiting principle, creating the same overbreadth the Supreme Court rejected in *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020), and Carson v. Makin, 142 S. Ct. 1987 (2022).

Each prohibition independently triggers strict scrutiny, and collectively they make § 72-3463 facially unconstitutional. Kansas stands virtually alone among the States in enforcing a Blaine-era "no-aid" overlay on its special-education framework. The Tenth Circuit's own decision in *Weaver* already forbids theological line-drawing of this kind. And under *Mahmoud v. Taylor*, 145 S. Ct. 1071 (2025), even indirect coercion – conditioning a public benefit on secular conformity – violates the Free Exercise Clause. The statute fails neutrality, fails general applicability, and fails the least-restrictive-means test.

These facial violations are compounded by the coercive structure Kansas has built around them.

III. **UNCONSTITUTIONAL CONDITIONS AND COERCION**

K.S.A. 72-3463 transforms a constitutional guarantee into a coercive bargain: the State will educate a disabled child for free only if the parent renounces religious education. That condition violates the unconstitutional-conditions doctrine recognized in *Sherbert v. Verner*, 374 U.S. 398 (1963), *Pierce v. Society of Sisters* and reaffirmed in *Mahmoud v. Taylor*. Under *Mahmoud*, coercion need not be direct to be unconstitutional. Kansas's "private-duty" rule penalizes parents for exercising faith by turning a government benefit into a personal debt. The Tenth Circuit and other circuits recognize that parental direction of a child's education is a fundamental liberty interest (*Pierce*; *Troxel v. Granville*, 530 U.S. 57 (2000)). Kansas cannot condition participation in a neutral federal program on surrendering that fundamental right.

IV. **IDEA AND INDIVIDUALIZATION**

IDEA requires an IEP "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas County Sch. Dist.*, 580 U.S. 386, 399 (2017). "Circumstances" means the child's actual educational setting. *L.B. v. Nebo* at 979. Blue Valley violated that rule by designing IEPs for a government-school curriculum that S.B. does not use while refusing to

consider his actual faith-based curriculum. The law's focus on "religious activity" collides directly with IDEA's command to individualize. Federal law is curriculum-neutral; Kansas law is not. That conflict also supports preemption – K.S.A. 72-3463 frustrates the purpose of the IDEA and cannot coexist with it.

## V. HOSTILITY TO RELIGION

Blue Valley's implementation of 72-3463 exposed overt hostility toward religion. Officials declared that religious activities serve no educational purpose and that religion cannot be integrated into an IEP (AA 2-136–37). Such remarks display the same bias condemned in *Masterpiece Cakeshop*. Administrative hostility to faith is evidence of pretext, not neutrality, and independently demands strict scrutiny. *See Fulton v. City of Philadelphia*, 593 U.S. 522 (2021).

## VI. EQUAL PROTECTION

Kansas also violates the Equal Protection Clause. Families of non-disabled students may choose private or religious schools without forfeiting government benefits, but families of disabled children cannot. The State's classification irrationally discriminates on the basis of disability and religion, failing even rational-basis review. *City of*

*Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432 (1985); *Espinoza*, 140 S. Ct. at 2257.

## VII. COMMISSIONER WATSON'S ENFORCEMENT ROLE

The district court erred in dismissing Commissioner Watson. KSDE enforces 72-3463 through binding guidance (K.A.R) Special Education Handbook), directing local districts to deny services in religious settings. That direct enforcement nexus satisfies *Ex parte Young*, 209 U.S. 123 (1908), and establishes ongoing state enforcement. *See Doe v. Lawrence Livermore Nat'l Lab.,* 131 F.3d 836 (9th Cir. 1997) (enforcement authority need not be exclusive to support injunctive relief). Having directed districts to enforce 72-3463, the Commissioner cannot escape review simply because enforcement is widespread.

## VIII. RELIEF

The appropriate remedy is declaratory and injunctive relief striking K.S.A. 72-3463's prohibitions as unconstitutional and preempted by IDEA. The State must design and deliver services without regard to religious context and must allow individualized IEPs that meet each child's actual needs. *Mahmoud* makes clear that government may not impose secularization as the price of inclusion.

In Kansas, the price of faith is forfeiture of the free education Congress guaranteed. The Constitution forbids that bargain.

## STANDARD OF REVIEW

Regarding motions to dismiss, this Court reviews First Amendment claims, Motion to Dismiss, and summary judgment rulings de novo. *Sanchez v. Guzman*, 105 F.4th 1285, 1292 (10th Cir. 2024). A lower court is required to take all of the plausible allegations as true and then draw all reasonable inferences in favor of the plaintiff. When a lower court is presented with cross-motions for summary judgment, it "must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *United States v. Sup. Ct. of N.M.,* 839 F.3d 888, 898 (10th Cir. 2016).

## ARGUMENT

### THE DISTRICT COURT INVERTED THE CONSTITUTIONAL INQUIRY BY TREATING THE CHALLENGED STATUTE AS THE LAWFUL BASELINE

The district court held that Appellants lack standing because they never requested services from BV. This holding reflects a fundamental analytical error: it presumes the constitutionality of K.S.A. 72-3463 – the very statute Appellants challenge – and uses that presumption to dismiss their claims at the threshold. The Free Exercise Clause requires the

opposite analysis. Before asking whether a plaintiff requested a benefit, a court must first examine whether the benefit was offered on unconstitutional terms. *Carson v. Makin* at 779-80; *Trinity Lutheran* at 462.

### BV'S "OFFER" CONTAINS AN UNCONSTITUTIONAL CONDITION

BV admits it enforces K.S.A. 72-3463, which categorically prohibits special education services "in connection with religious courses, devotional exercises, religious training or any other religious activity." BV testified it will "never" provide services during religious instruction, AA 2-188 (p.89:6-25), and designs IEPs only for its own secular curriculum – not for the religious curricula children actually study. AA 2-253-54. BV's "offer" is therefore: Accept our secular curriculum or receive nothing. This is not a neutral offer that Terri declined. It is an unconstitutional condition that strips parents of curriculum control – a fundamental right under *Pierce* at 534-35 – as the price of receiving federally mandated services. The Constitution required BV to offer services free from K.S.A. 72-3463's religious exclusions. BV refused, admitting it would "never" disconnect its services from that statute. Because BV offered only services conditioned on surrendering religious

curriculum, there was nothing constitutionally adequate for Terri to request.

## BV'S OFFER IS CONTRARY TO THE IDEA

BV's offer includes an IEP. BV will design an IEP only for BV's government curriculum. BV will not consider S.B.'s real and used religious curriculum when developing his IEP. BV will not acknowledge that S.B. has religious educational needs that include religious instruction via his religious curriculum. Thus BV's offer to Terri was to only provide its skewed services to S.B. only when Terri must conform to BV's curricular government school framework – both by attending BV school part or full time and then by accepting an IEP designed for a government school curriculum S.B. does not need, of which Terri does not want.

But IDEA is curriculum-neutral. IDEA uses the definite article 'the general education curriculum' – pointing to the child's actual curriculum, whatever it is. IDEA does not say 'the government's curriculum' or 'the public school's curriculum' or 'a state-approved curriculum.'

## THOSE LIMITING WORDS DO NOT APPEAR IN THE STATUTE

BV has added words Congress did not write. BV reads IDEA as if it said 'the district's general education curriculum.' This addition transforms IDEA from a curriculum-neutral statute into a public-school-preference statute. It makes private school curricula – including religious curricula – educationally irrelevant for IEP purposes.

Congress did not enact IDEA to create a government school monopoly on educational legitimacy. Congress enacted IDEA to ensure disabled children receive appropriate services wherever they are educated. The statute's curriculum-neutral language reflects this intent. BV's curriculum-control interpretation contradicts the statute's text and purpose.

**THE SUPREME COURT HAS REPEATEDLY REJECTED THE "NO REQUEST, NO INJURY" FRAMEWORK**

The district court's reasoning – that Appellants must request unconstitutionally conditioned services before challenging them – contradicts binding Supreme Court precedent. In *Trinity Lutheran*, Missouri offered playground resurfacing grants to schools but categorically excluded religious schools. When Trinity Lutheran Church challenged this exclusion, Missouri argued the church "could have" applied for the discriminatory grant and been rejected – in effect,

claiming "no injury without a request." The Supreme Court rejected this, holding that the discriminatory offer itself was the injury. The church need not "request what amounts to a denial of its religious character." 582 U.S. at 462.

Similarly, in *Carson v. Makin*, Maine conditioned tuition assistance on schools agreeing not to provide religious instruction. The Supreme Court held this violated the Free Exercise Clause. Before examining whether parents had requested services under the discriminatory program, the Court asked whether "the benefit was otherwise available" or was "withheld on unconstitutional terms." 596 U.S. at 779-80. The answer determined standing. Once the Court found Maine's exclusion unconstitutional, the plaintiffs had standing regardless of whether they had formally requested benefits under the invalid scheme.

Most recently, in *Nathan v. Alamo Heights Independent School District*, 2025 WL 5678193 (W.D. Tex. June 20, 2025), a federal court applied this framework to analogous facts. Texas enacted a statute requiring government schools to display the Ten Commandments. Parents challenged the statute on Establishment Clause grounds. The school district argued parents lacked standing because they had not

requested removal of the displays. The court rejected this argument, holding that parents need not request removal of state-mandated displays before challenging the statute requiring them, because "the constitutional harm flows directly from the State's enactment and implementation of the statute itself." *Id.* at *10.

The same principle governs here. Kansas enacted K.S.A. 72-3463, which categorically excludes services during religious activities. BV implements this statute by refusing to design IEPs for religious curricula and categorically denying services in religious educational settings. The constitutional harm – exclusion based on religious content – flows directly from the statute and its enforcement. Terri need not request services under an unconstitutionally discriminatory scheme before challenging it.

**THE DISTRICT COURT'S APPROACH PRODUCES CIRCULAR REASONING**

The district court's analysis creates an impossible logical loop: (1) Terri must request services to establish injury; (2) but the only services available are those authorized by K.S.A. 72-3463; (3) therefore, Terri must request services stripped of religious content; (4) if she does not request such services, she has no standing to challenge the statute that

strips religious content. This reasoning presupposes the answer to the constitutional question at issue. If K.S.A. 72-3463 is unconstitutional – which is what Appellants allege – then BV's "offer" of services under that statute cannot satisfy constitutional requirements. Requiring Terri to request unconstitutionally conditioned services as a prerequisite to challenging the conditions makes the constitutional violation unreviewable. The district court treated K.S.A. 72-3463 as the lawful baseline rather than the object of constitutional scrutiny.

*Carson*, *Trinity Lutheran*, and *Nathan* all reject this approach. The proper inquiry is not "Did the plaintiff request the discriminatory benefit?" but rather "Did the State offer benefits on discriminatory terms?" Once the answer to the second question is "yes," standing exists. The plaintiff need not participate in the unconstitutional scheme to challenge it.

### TERRI DOES NOT NEED TO REQUEST WHAT KANSAS LAW PROHIBITS IN ORDER TO BE INJURED

The district court's holding also ignores Kansas law. K.S.A. 72-3463 does not authorize districts to provide services during religious activities if parents request them. It categorically prohibits such services. Requiring Terri to request what state law forbids BV from providing

would be an exercise in futility. BV confirmed this. When asked whether it would ever provide services during religious instruction, BV testified "never." AA 2-188. BV will not design IEPs for religious curricula. AA 2-253-54. These are not discretionary policies that requests might overcome. They are categorical rules implementing K.S.A. 72-3463. Terri cannot request her way out of a statutory prohibition.

The Supreme Court has repeatedly held that plaintiffs need not engage in futile acts to establish standing. *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 409 (2013). Demanding that Terri request services Kansas law categorically prohibits and BV will "never" provide serves no purpose except to erect a procedural barrier to constitutional review.

**THE DISTRICT COURT COLLAPSED THE MERITS INTO STANDING**

By requiring Terri to request services under K.S.A. 72-3463 before challenging that statute, the district court collapsed the merits into standing. Whether K.S.A. 72-3463 violates the Free Exercise Clause is the central question on the merits. The district court effectively held that Appellants cannot establish standing to raise that question without first accepting the statute's validity – the very issue in dispute. This approach immunizes unconstitutional statutes from pre-enforcement review. If

plaintiffs must request benefits under a discriminatory scheme before challenging it, then discriminatory schemes that categorically exclude certain groups can never be challenged until someone requests inclusion and is formally denied. But *Trinity Lutheran*, *Carson*, and *Nathan*, and *Mahmoud* all involved facial challenges to exclusionary statutes, and none required plaintiffs to request discriminatory benefits before establishing standing.

The constitutional violation here is not BV's hypothetical denial of a future request. The violation is Kansas's enactment and BV's enforcement of a statute that categorically excludes religious activities from special education services. That violation inflicts present injury: Terri must either pay privately for services Kansas should provide or surrender her right to provide S.B. with religious education. Either way, she is injured now – not at some speculative future point when she might make a request BV has promised to "never" grant.

The district court inverted the constitutional inquiry by asking "Did Terri request services?" before asking "Were the offered services constitutional?" The Free Exercise Clause requires the opposite sequence. Once BV conditioned services on exclusion of religious content

– enforcing K.S.A. 72-3463's categorical prohibition – its "offer" became constitutionally defective. Terri need not request services that condition constitutional rights on their surrender. As *Trinity Lutheran* makes clear, she need not apply for what amounts to a denial of her religious character and parental authority. The discriminatory offer itself, backed by statutory command and BV's categorical enforcement, is the injury.

BV's position is legally untenable. BV contends that all special-education services must conform to its own secular curriculum, regardless of where the child is actually educated. That interpretation conflicts with IDEA's text and this Court's precedent. IDEA requires that an IEP enable a child to make progress in "the general education curriculum." 34 C.F.R. § 300.320(a)(2)(i). The regulation's use of the definite article – "the" – refers to the particular curriculum the child actually follows. Congress did not write "the district's curriculum," "the government school's curriculum," or "a state-approved curriculum." It wrote "the general education curriculum." For each child, that phrase points to the general curriculum of the educational environment in which the child is placed.

This Court has consistently held that an IEP must address "the educational setting in which the child will actually be placed" and confer "meaningful benefit" within that real environment – not in a hypothetical one. *L.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 976 (10th Cir. 2004) (emphasis added); *Thompson R2-J Sch. Dist. v. Luke P.*, 540 F.3d 1143, 1153–54 (10th Cir. 2008). When a district drafts an IEP as if the child were enrolled in government school, it measures progress by a fictional yardstick and nullifies IDEA's individualized mandate.

For S.B., the "actual placement" is a religious private school or "homeschool" using a Bible-integrated curriculum. An IEP designed for BV's secular curriculum cannot meaningfully evaluate or support his progress in that setting. Dr. Schmidt confirmed this when he testified that S.B. must be enrolled at BV and obtain an IEP only designed to make progress in BV's general education curriculum. AA 5-79 (p.138). BV's interpretation converts IDEA's promise of "personalized instruction," *Bd. of Educ. v. Rowley*, 458 U.S. 176, 181 (1982), into a uniform state-curriculum requirement. This interpretation effectively rewrites IDEA, transforming "the general education curriculum" into "BV's preferred

curriculum" and privileging government-school conformity over parental choice and individual need.

## NO COMPELLING INTEREST IN 72-3463

Kansas has no compelling interest in categorical religious exclusion. Kansas cannot point to any compelling interest that requires prohibiting special education services in connection with any religious activity. The Establishment Clause does not compel this result. The statute would fail even rational basis review. Kansas has no rational basis for treating religious curricula as categorically incompatible with the delivery of special education services. IDEA is curriculum-neutral – it requires services for children in private schools, including religious schools. 34 C.F.R. §§ 300.130-144. Kansas law recognizes parental curriculum control for non-disabled children through school choice statutes. K.S.A. 72-3120(h); HB 2567. The only rational explanation for prohibiting services during religious activities while permitting them during secular activities is hostility toward religion – which is not a legitimate governmental interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993).

## HOSTILITY TO RELIGION

BV's implementation demonstrates the hostility condemned in *Masterpiece Cakeshop.* BV has gone beyond merely enforcing K.S.A. 72-3463's prohibition to assert theological and pedagogical authority over Terri's decisions:

BV declared that S.B. does not "need" religious materials for reading, substituting the State's judgment for the parent's determination of her child's educational and spiritual needs.

BV claimed authority to interpret Terri's religious beliefs, characterizing her description of BV's environment as "godless" as a "term of derision rather than a statement of religious belief" – telling Terri what she really means better than she knows herself.

BV took "umbrage" at being accurately described as maintaining a religion-free ("godless") environment, suggesting that truthful characterization of its mandatory secular policy is somehow offensive.

BV admitted it teaches ideologies but "not of the religious kind," revealing that its policy is not neutral exclusion of all ideological content but targeted exclusion of religious ideology. BV claimed that providing services while S.B. copies Bible verses would require "infusing" religious teaching into therapy – a claim that betrays either profound confusion

about what neutral services are or deliberate hostility toward accommodating religion.

### *MAHMOUD* INTERFERENCE WITH PARENTAL CHOICES

Kansas substitutes the State's educational and theological judgments for parents' decisions in violation of *Pierce v. Society of Sisters*. The *Mahmoud* decision reinforced that principle. The fundamental right to direct one's child's education includes the right to choose religious instruction. Kansas does not merely fail to subsidize that choice – it penalizes it by denying federally mandated services available to all other children.

BV asserts it knows better than Terri what S.B. "needs" religiously and educationally. BV claims authority to determine that religious materials serve no educational purpose for reading instruction. BV insists on designing S.B.'s IEP for a public-school curriculum he does not follow rather than his actual religious curriculum. BV demands Terri secularize as a condition of accessing services – usurping parental authority over curriculum selection as the price of federal benefits.

This is precisely what *Mahmoud* and *Pierce* forbids: "The child is not the mere creature of the State; those who nurture him and direct his

destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." 268 U.S. at 535. Kansas may not condition special education services on parents surrendering *Pierce* rights.

UNCONSTITUTIONAL CONDITIONS

The State conditions access to federally guaranteed IDEA services on parents' agreement to secularize their children's education. Kansas law constructs a forced choice:

**OPTION ONE**: Accept services at BV in its admittedly religion-free, "godless" environment and curriculum, where ideologies are taught but "not of the religious kind," and S.B.'s IEP will be designed to make progress in BV's government curriculum that Terri does not want and S.B. does not use.

**OPTION TWO**: Maintain S.B.'s religious curriculum and pay privately for all services, evaluations, and therapies – while remaining legally obligated under K.S.A. 72-3421 to ensure S.B. receives those services, with potential child welfare reporting if Terri fails to comply.

The Constitution forbids conditioning public benefits on surrender of constitutional rights. As the Court explained in *Sherbert v. Verner*, 374

U.S. 398, 404 (1963), forcing a choice between religious practice and public benefits imposes a "burden upon the free exercise of [religion]" that requires strict scrutiny justification. Kansas offers none. The state has no compelling interest in excluding neutral services from religious educational settings, and categorical exclusion is not narrowly tailored even if such an interest existed.

*Mahmoud* confirms that ongoing financial penalties for religious school choice are unconstitutional. Kansas goes further, adding legal coercion (parental duty statute with child welfare reporting threat), theological coercion (State determines what children "need" religiously), and educational coercion (State dictates curriculum as condition of services). This compounded coercion makes Kansas's scheme even more constitutionally infirm than the Maryland policy *Mahmoud* invalidated.

In *Trinity Lutheran* Missouri excluded churches from a playground resurfacing grant program solely because of their religious character. The Court held this violated the Free Exercise Clause. Denying "an otherwise available benefit solely because of religious identity" imposes "a penalty on the free exercise of religion." *Id*. at 462. The Court emphasized that the exclusion was categorical: "The State in this case expressly requires

Trinity Lutheran to renounce its religious character in order to participate." *Id.* at 464.

In *Espinoza* Montana excluded religious schools from a scholarship program. The Court held that "a State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious." *Id.* at 482. The Court rejected Montana's argument that the exclusion was required by its state constitution's no-aid provision, holding that "a State's interest in maintaining a [no-aid] amendment... cannot qualify as compelling in the face of the infringement of free exercise." *Id.* at 486.

In *Carson* Maine excluded "sectarian" schools from a tuition assistance program – not just schools with religious identity, but schools that integrated religion into instruction. The Court held this violated the Free Exercise Clause. A "neutral benefit program in which public funds flow to religious organizations through the independent choices of private benefit recipients does not offend the Establishment Clause." *Id.* at 779 (cleaned up). Maine could not "condition the receipt of benefits on a recipient's willingness to... refrain from particular religious activity." *Id.* at 780.

Finally in *Mahmoud* Maryland's imposition of ongoing financial burdens on parents who choose a religious curriculum was held unconstitutional, holding that states may not "force parents to bear financial and spiritual costs as the price of exercising religious school choice." Kansas does exactly what *Mahmoud* forbids: it imposes financial penalties on parents such as Terri who choose religious education for their special-needs children.

K.S.A. 72-3463 violates all these precedents. Kansas provides special education services as a generally available benefit. Once it chooses to do so, it cannot exclude providing services based on the religious content of the student's religious curriculum. The statute's categorical prohibition – no services "in connection with" any religious activity – is facial discrimination that fails strict scrutiny.

Finally, overlay Kansas scheme with *Zobrest v. Catalina Foothills School District*, 509 U.S. 1 (1993). The Court in *Zobrest* held that providing a sign-language interpreter to a student at a Catholic high school, even during religious classes and Mass, does not violate the Establishment Clause. If a government school providing interpretation to a special needs student during a Catholic Mass is constitutional,

providing services to S.B. during all of the activities 72-3463 prohibits is constitutional as well.

### EQUAL PROTECTION – CREATING A DISFAVORED SUBCLASS

Kansas denies parents of special-needs children the curricular autonomy all other parents enjoy. Under HB 2567, non-disabled children can enroll part-time in public schools to access any courses, programs, or services while maintaining their religious homeschool curriculum. Kansas recognizes these families' right to school choice and facilitates it.  But children with disabilities must make a different choice: surrender religious curriculum or lose IDEA services. Kansas creates two classes of homeschool families:

**CLASS ONE**: Parents of non-disabled children – full school choice, full access to public programs, no requirement to secularize.  Private schools structure is not limited.

**CLASS TWO**: Parents of disabled children – conditional school choice, access to public programs only if curriculum is secularized, State determines religious content is educationally unnecessary. The private school must be a 501(3)(C) including homeschools.

A child's disability has no logical connection to the State's decision to exclude that child from non-accredited or parent-directed private schools. Kansas redefines what counts as a "school" only for disabled children—limiting them to corporately organized, § 501(c)(3) institutions – while permitting all other children to attend any private or home school of their parents' choosing. That structural narrowing has nothing to do with pedagogy, accountability, or IDEA compliance; it simply eliminates the small, faith-based, and home-based schools that embody parental autonomy. The result is perverse: the very children IDEA was enacted to protect are the only ones Kansas forces to secularize or institutionalize their education. In this regime, children who need individualized instruction the most lose both parental direction and curricular freedom. By turning disability into a gateway for government control, Kansas uses IDEA as a vehicle to deny equal treatment. This arbitrary distinction—tethered to tax status rather than educational substance—bears no rational relationship to any legitimate state interest and thus violates equal protection.

**WATSON'S OFFICIAL-CAPACITY ROLE AND THE REAL PARTY IN INTEREST**

The Amended Complaint complains of K.S.A. 72-3463 being imposed upon the home schools and their curriculum. Neither can obtain the benefit of special needs push-in services because of that statute. The Complaint defines exactly who Watson is sued as and what entity he represents. AA 1-42. (¶47). "Defendant Randy Watson is the State Commissioner of Education and is responsible for overseeing the certification and renewal of nonpublic schools. Watson is sued in his official capacity only." *Id.* Those allegations – accepted as true under Rule 12(b)(6) – fix the identity of the real party in interest as KSDE and the Kansas State Board of Education.

The "identity of the real party in interest depends on the pleadings and the nature of the relief sought, not on the defendant's characterization of his role." *Lewis v. Clarke,* 581 U.S. 155, 162 (2017). *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). Courts must accept official-capacity allegations as true and construe them favorably to the plaintiff. *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020),

Kansas Law and KSDE's Own Website Confirm Watson Represents KSDE

K.S.A. 72-3463 is recognized, endorsed, and enforced by KSDE. The plaintiffs challenge the Constitutionality of that statute facially and as applied. Kansas law leaves no doubt that the Commissioner of Education is KSDE's executive head. Kan. Const. art. 6 § 4(a); K.S.A. 75-3702a(c) ("commissioner of education shall be the executive officer of the state board of education and the chief administrative officer of the state department of education"). "The Commissioner of Education serves as the executive officer of the State Board and carries out the administrative functions of the Department of Education." *U.S.D. No. 443 v. Kansas State Bd. of Educ.*, 266 Kan. 75, 83 (1998). The Commissioner administers regulations such as K.A.R. 91-40-48 and enforces statutes such as K.S.A. 72-3463 – he acts on behalf of the state of Kansas, KSDE and the Board.

KSDE's website confirms this organizational structure and his enforcement role. (AA 2-199 & 2-204). The "Office of the Commissioner" page describes Watson's role. The "Division of Learning Services" page explains that it "engages in federal and state program administration: approval, compliance and licensure; educational assistance and school improvement." This division "provide[s] consultative services for general

and special education programs" and ensures "compliance" with state and federal requirements. AA 2-204.

Under this framework, when the Commissioner administers his Handbook (AA 3-268) K.A.R. 91-40-48 – a regulation promulgated by KSDE – and oversees LEA (BV) compliance with K.S.A. 72-3463 and K.S.A. 72-3421.

## WATSON'S MOTION AND THE DISTRICT COURT'S ERROR

The statutory and regulatory private-duty requirement coupled with 72-3463 injures S.B. and Terri. Watson disclaimed that connection arguing a failure "to allege any specific act or omission by Commissioner Watson that caused their alleged injury" AA 1-82. (pp.6-8). Yet simultaneously, he invoked Eleventh-Amendment immunity as an arm of the State. If he represents the State for immunity, he represents the State for accountability. *Hafer*, 502 U.S. at 25; *Graham*, 473 U.S. at 165-66. Watson argued he personally lacked enforcement authority (contradicted by KSDE's own published description). AA 2-204. The district court accepted his framing: "Plaintiffs fail to connect their alleged injury to any act or omission by Defendant Watson." Add 58 p.11; AA 1-158.) This was error. That conclusion applies an *Iqbal* personal-

participation standard that governs individual-capacity claims, not official-capacity suits. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). The question is not whether the named official personally acted, but whether the governmental entity he represents has enforcement authority over the challenged law. *Ex parte Young*, 209 U.S. 123, 157 (1908). The Tenth Circuit holds that a general statutory duty to enforce suffices to name a state officer. *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007); *Hill v. Kemp*, 478 F.3d 1236, 1255 (10th Cir. 2007); *Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014); *Chiles v. Thornburgh*, 865 F.2d 1197, 1209 (10th Cir. 1989).

The Amended Complaint alleges that Watson – in his official capacity as KSDE's chief officer – enforces Kansas's special-education statutes and regulations through KSDE. KSDE's own website confirms that enforcement role. That allegation must be accepted as true and is sufficient under *Ex parte Young* and *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) (enforcement connection "need not be precise").

Once the analysis focuses on the correct entity KSDE, that agency doesn't merely promulgate regulations – it directly instructs LEAs how

to apply them through the Handbook. Schmidt affirms this phenomenon. The Handbook itself declares: "The Kansas Special Education Process Handbook was developed as a guidance document by the Kansas State Department of Education." AA 3-143. BV acknowledges it follows this Handbook in implementing special education services. This creates direct, documented enforcement that exceeds even *Prairie Band's* "general statutory duty" standard. KSDE doesn't just oversee compliance abstractly – it authors the operative manual that LEAs follow to implement the challenged restrictions. When KSDE publishes a handbook that LEAs follow to implement special education requirements, and BV relies on that handbook to deny services based on the religious restrictions, KSDE is enforcing 72-3463. The district court's conclusion that Watson lacks a "connection" to Plaintiffs' injuries is contradicted.[2]

---

[2] The Handbook quotes the statute verbatim and instructs LEAs that state law "forbids" services in religious setting…. Under Kansas law, the Commissioner is KSDE's "chief administrative officer." K.S.A. 75-3702a(c). KSDE publishes guidance under Watson's administration that instructs LEAs how to implement 72-3463. The fact that BV follows the Handbook's interpretation of 72-3463 in conditioning  services confirms that the Handbook functions as an enforcement mechanism, not mere optional guidance.

The Handbook doesn't merely reference the challenged statute – it instructs LEAs to apply it. The Handbook states:

> State law allows for services to be provided at either the public or private school, but forbids the provision of special education and related services in connection with religious courses, devotional exercises, religious training, or any other religious activity.

The Handbook then quotes the statute verbatim: "K.S.A. 72-3463. Same; provision in connection with religious activity prohibited. No special education services shall be provided in connection with religious courses, devotional exercises, religious training, or any other religious activities..." AA 4-166; 1-232 (BV admission 39). BV admitted that it denied services under K.S.A. 72-3463. AA 1-174-175. The private duty regulation and K.A.R. 91-40-48 were authored, published, and enforced by KSDE under the Commissioner's authority. K.S.A. 72-3463, enacted by the Kansas Legislature, is implemented and enforced through KSDE's oversight of LEAs. The injuries to S.B. and Terri are traceable to Watson and KSDE, which enforce 72-3463 through the Handbook and oversight of LEAs, and redressable by an injunction prohibiting that enforcement.

Watson cannot toggle between identities – State for immunity, individual for accountability. That paradox would render *Ex parte Young* a nullity in Kansas. Federal courts consistently reject such maneuvers.

*Verizon Md*., 535 U.S. at 645; *Lewis v. Clarke*, 581 U.S. at 162. A state officer is a proper defendant "when by virtue of his office he has some connection with the enforcement of the act." *Ex parte Young*, at 157. Watson' statutory connection is undeniable.

### THE DISTRICT COURT RESOLVED FACTUAL DISPUTES IMPROPERLY

By crediting Watson's factual denials rather than Plaintiffs' jurisdictional allegations, the lower court inverted the Rule 12 framework. On a motion to dismiss: allegations are true. *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011). Accepting Watson's contrary denials at the pleading stage resolved a contested fact against the non-movant – clear reversible error.

Whether Watson personally takes specific enforcement actions is irrelevant in an official-capacity suit. The question is whether KSDE – the entity Watson represents – has sufficient connection to the challenged provisions. The Amended Complaint adequately alleges that it does.

### CONCLUSION

This case is about control – who directs the curriculum of a disabled child in Kansas: the parent or the State. Kansas grants every family full

freedom to design its child's education, but the moment a disability is diagnosed, that freedom vanishes. For families like Terri Baker's, Kansas law makes the exercise of faith the price of receiving the "free" public education Congress guaranteed to every child with disabilities.

Under *K.S.A. 72-3463*, no special-education service may be provided "in connection with any religious activity." That single sentence transforms Kansas into an outlier among the States. No other state imposes what § 72-3463 prohibits. Federal law under 20 U.S.C. § 1412(a)(1) and § 1412(a)(10)(B) allows states to deliver services in private and religious schools alike, but Kansas alone adds its own poison pill: a "private duty" that converts the *free* in FAPE into a personal, permanent, and costly obligation.

In Kansas, when a parent leaves the public-school system for reasons of conscience or curriculum, the "free" services do not simply stop – they become the parent's bill. What Congress offered as choice, Kansas recasts as punishment: the "free" services become a financial trap. Terri Baker cannot walk away from the government's IEP without assuming its cost. She and other parents are captured: once inside the IEP system, they may depart only if the public-school IEP team decrees their child no

longer needs services. It is a one-way gate that binds the parent's liberty to the State's curriculum. The law's message is unmistakable – *sure, go your own way, but first let us attach this heavy "Egypt-curriculum" anchor to your neck.*

That is not equality of school choice; it is coercion by design. Kansas has built a regime in which the government always wins: either the parent accepts a secular IEP designed for a public-school curriculum, or the parent pays out-of-pocket for what should be publicly funded. No other state does this. The government pays – or the parent pays – but in Kansas, the parent can never be free. The only path to the "free" benefit runs through the Blaine-era no-aid clause embodied in § 72-3463, which disables services whenever religion appears.

The consequences are not theoretical. As education scholars have observed, children with disabilities are among those least well served by rigid district systems. *See* NICOLE STELLA GARNETT, *UNLOCKING THE POTENTIAL OF PRIVATE-SCHOOL CHOICE*, MANHATTAN INST. POLICY REP. 8 (MAR. 2023), https://shorturl.at/iBJVY ("students with disabilities" are chief among the "children who are not well served by district public schools"). The entire point of the IDEA was to meet each disabled child's

"unique needs" and adapt educational services to those needs. 20 U.S.C. § 1400(d)(1)(A). Plaintiff S.B. exemplifies this failure: public schools have proven wholly unable to satisfy his "other educational needs," which are religious. Blue Valley will never design an IEP to meet S.B.'s religious educational needs because of its no-religious-activity rule. Not only is S.B. denied; Terri cannot even compete to receive those services unless she converts to secular education. *See Trinity* at 463. ("The express discrimination against religious exercise here is … the refusal to allow [a religious applicant] … to compete with secular organizations for [a public benefit].").

And so, Kansas has created a system that is systemically unconstitutional in every aspect of its application – from the creation of IEPs to the delivery of special-education and related services. It targets religion for special disabilities, punishes parents for exercising faith, and subordinates the family's educational autonomy to the State's secular ideology. This appeal seeks to end that coercive regime and restore what the Constitution and Congress both promised: a genuinely *free* appropriate public education, not one conditioned on the surrender of conscience.

1. **STANDING AND FUTILITY**

The district court's first and most fundamental error was treating futility as defeat. By requiring Terri Baker to request what *K.S.A. 72-3463* categorically forbids, the court transformed Article III standing into a Catch-22: she must seek what the State has already outlawed to prove injury. But the injury exists precisely because Kansas has imposed a blanket prohibition. Standing exists where the law itself bars the benefit and forces parents into an impossible choice between faith and participation in a public program.

2. **ONGOING INJURY TO PARENT AND CHILD**

Terri continues to pay privately for evaluations and therapies that Kansas law obligates Blue Valley to provide. S.B. continues to go without an IEP designed for his actual education. These are concrete, ongoing injuries traceable to *K.S.A. 72-3463* and fully redressable by declaratory and injunctive relief.

3. **FREE EXERCISE AND USE-BASED DISCRIMINATION**

*K.S.A. 72-3463* is a textbook example of use-based religious discrimination. It forbids special-education services "in connection with any religious activity" – language the Supreme Court has already

condemned in *Trinity Lutheran*, *Espinoza*, and *Carson*. The Free Exercise Clause does not permit Kansas to exclude families merely because their education integrates faith with learning. No compelling interest justifies this categorical exclusion, and none can be imagined. K.S.A. 72-3463 mirrors the "pervasively sectarian" exclusion the Tenth Circuit invalidated in *Colorado Christian*. There, Colorado denied scholarships to students attending institutions it deemed "too religious." The Court held that such theological line-drawing – disqualifying recipients based on the religious nature or content of their education – constitutes viewpoint discrimination and violates the Free Exercise and Establishment Clauses alike. Kansas's statute likewise disqualifies children from receiving IDEA services whenever their education is "in connection with any religious activity," compelling officials to decide what counts as "religious." That inquiry is precisely what *Colorado Christian* forbids. The statute therefore fails even under this Circuit's own precedent, apart from the more recent *Trinity Lutheran, Espinoza, and Carson* decisions.

4. **UNCONSTITUTIONAL CONDITIONS AND COERCION**

Kansas has turned the "free" in FAPE into a penalty for conscience. Blue Valley's only offer — "come to our godless environment or get nothing" — forces religious families to secularize their child's instruction to obtain benefits everyone else receives automatically. That is not neutrality; it is coercion. Under *Sherbert*, *Fulton*, and *Mahmoud*, the government may not make the enjoyment of a public benefit conditional on abandoning religious exercise.

## 5. CURRICULAR CONTROL AND PARENTAL DIRECTION

Blue Valley's refusal to design an IEP for S.B.'s actual homeschool curriculum violates both the IDEA and the parental-rights guarantees of *Pierce v. Society of Sisters*. The Constitution does not allow the State to substitute its educational philosophy for the parent's. When Kansas tells parents that the price of individualized education is surrendering their curriculum, it inverts the IDEA's purpose and violates the liberty the Fourteenth Amendment protects.

## 6. EQUAL PROTECTION

Secular private-school students receive public services without surrendering their curriculum; religious-school students are categorically excluded. That is discrimination by status and use alike.

The Fourteenth Amendment forbids the State from dividing parents into favored and disfavored classes based solely on faith.

### 7. PROCEDURAL DUE PROCESS AND STATE CAPTURE

Once a child has an IEP, Kansas law allows only the public-school team to dissolve it. Parents who wish to leave the system are legally captive to it. This bureaucratic lock-in deprives parents of notice, choice, and autonomy − a deprivation the Due Process Clause will not tolerate.

### 8. RELIEF AND REDRESSABILITY

Each of these constitutional defects is traceable to one source − *K.S.A. 72-3463* and its implementing regulation, *K.A.R. 91-40-48(c)(2)*. Striking them will remove the barrier that Blue Valley invokes, free families from compelled secularization, and restore the parity the Constitution demands. Relief would immediately allow S.B. and similarly situated students to receive services consistent with both their faith and their educational needs.

The district court's judgment should therefore be **reversed**. This Court should declare *K.S.A. 72-3463* and *K.A.R. 91-40-48(c)(2)* unconstitutional, vacate the summary judgment for Blue Valley, and remand with instructions to enter declaratory and injunctive relief

consistent with the Free Exercise, Equal Protection, and Due Process Clauses of the United States Constitution.

**ORAL ARGUMENT STATEMENT**

Appellants respectfully requests oral argument. This case involves important and complex First Amendment issues that greatly affect each appellant and others' constitutional freedoms. Oral argument will materially help this Court decide the issues.

Dated: October 17, 2025

Respectfully submitted,
s/ Linus L. Baker

|  | Linus L. Baker<br>6732 West 185th Terrace<br>Stilwell, Kansas 66085<br>913.486.3913<br>linusbaker@prodigy.net<br>*Attorney for Appellants* |
|---|---|

**CERTIFICATE OF COMPLIANCE WITH RULE 32(A)**

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

     1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,596 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

     2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a 14-point proportionally spaced Century Schoolbook typeface using Microsoft Word 2019.

Date: October 17, 2025         <u>s/ Linus L. Baker  </u>
                                    Linus L. Baker

**CERTIFICATE OF DIGITAL SUBMISSION**

1.     I hereby certify that all required privacy redactions have been made.

2.     I hereby certify that a hard copy of the Appellants' Opening Brief will be submitted to the Court pursuant to 10th Cir. R. 31.5 and will be an exact copy of the version submitted electronically via the Court's ECF system.

3.     I hereby certify that this document has been scanned for viruses with the most recent version of a commercial virus scanning program, Norton 360, and is free of viruses according to that program and is free of viruses according to that program.

Date: October 17, 2025              s/ Linus L. Baker
                                    Linus L. Baker

**CERTIFICATE OF SERVICE**

I hereby certify that on October 17, 2025, a true and accurate copy of this brief and addenda was electronically filed with the Court using the CM/ECF system, which will send notification of such filing to the following:

Gregory Goheen
Kansas City, Kansas 66103
Telephone: (913) 371-3838
Facsimile: (913) 371-4722
E-mail:ggoheen@mvplaw.com
ATTORNEY FOR DEFENDANT RANDALL WATSON-
APPELLEE

W. Joseph Hatley
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
(816) 474-8100
(816) 474-3216 (Fax)
jhatley@spencerfane.com
ATTORNEY FOR BLUE VALLEY UNIFIED SCHOOL
DISTRICT NO. 229  APPELLEE
Date: October 17, 2025                  s/ Linus L. Baker
                                        Linus L. Baker

# ADDENDUM

Memorandum and Order July 22, 2025 ......................................... A-1

Final Judgment ............................................................ A-11

20 U.S.C. § 1400(d)(1)(A) .................................................. A-12

20 U.S.C. § 1412(a)(1) ..................................................... A-13

20 U.S.C. § 1412(a)(10)(B) ................................................. A-14

34 C.F.R. § 300.199(a)(2) .................................................. A-15

34 C.F.R. § 300.320(a)(2)(i) ............................................... A-16

K.A.R. 91-40-27 ........................................................... A-17

K.A.R. 91-40-43. .......................................................... A-19

K.A.R. 91-40-48 ........................................................... A-20

K.S.A. 72-3120(h) ......................................................... A-21

K.S.A. 72-3421 ............................................................ A-24

K.S.A. 72-3429(c) ......................................................... A-25

K.S.A. 72-3461(c) ......................................................... A-28

K.S.A. 72-3463 ............................................................ A-29

K.S.A. 72-4345 ............................................................ A-30

K.S.A. 75-3702a(c) ........................................................ A-31

Kan. Const. art. 6, § 4(a). ............................................... A-32

In the United States District Court
for the District of Kansas

————————

Case No. 23-cv-04022-TC

————————

TERRI E. BAKER, ET AL.

*Plaintiffs*

v.

RANDALL D. WATSON, ET AL.,

*Defendants*

————————

## MEMORANDUM AND ORDER

Plaintiff Terri Baker, as next friend of her son S.B., sued Mark Schmidt, the Assistant Superintendent of Special Education for Blue Valley School District. Doc. 1. She alleges that Kansas's statutory and regulatory framework for special education services violates the First and Fourteenth Amendments of the United States Constitution. *Id.* Schmidt now moves for summary judgment, Doc. 119, and Baker moves for partial summary judgment, Doc. 121. For the following reasons, Schmidt's motion is granted, and Baker's motion is denied as moot.

## I

## A

Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is necessary to resolve a claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are

irrelevant. *Brown v. Perez*, 835 F.3d 1223, 1233 (10th Cir. 2016). Indeed, belaboring such disputes undermines the efficiency that Rule 56 seeks to promote. *Adler*, 144 F.3d at 670.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(a)–(c). To determine whether a genuine dispute exists, the court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee, Okla.*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record. *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

In a case where the moving party does not bear the burden of persuasion at trial, the summary judgment rules require that party to show the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991); *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to dispositive matters. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

But in a case where the moving party will bear the burden of proof at trial on a particular issue, the moving party must meet "a more stringent summary judgment standard." *Pelt*, 539 F.3d at 1280; *see also Donner v. Nicklaus*, 778 F.3d 857, 876 (10th Cir. 2015) (discussing a movant with affirmative defenses). That standard requires the movant to "establish, as a matter of law, all essential elements of the issue." *Pelt*, 539 F.3d at 1280. Only then must the nonmovant "bring forward any specific facts alleged to rebut the movant's case." *Id.*

The filing of cross-motions for summary judgment does not alter this standard. Each motion—and its material facts—must "be treated separately," meaning that "the denial of one does not require the grant of another." *Atl. Richfield Co. v. Farm Credit Bank Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

**B**

This is a dispute concerning the State of Kansas's provision of an appropriate education to students with specialized needs. And the parties have engaged in significant litigation to date.[1] *See* Docs. 109 & 119. But before laying out the facts and procedural history, it is useful to contextualize the dispute by briefly explaining the legal framework that Baker challenges. *See* Doc. 119 at 4–5.

**1.** The State of Kansas receives federal money under the Individuals with Disabilities Education Act (IDEA). *See* 20 U.S.C. § 1400 *et seq.* That funding comes with obligations, one of which is that Kansas must give disabled children a free appropriate public education. 20 U.S.C. § 1412(a)(1). Schools work with parents to develop an individualized education program (IEP) for children with special needs. *Honig v. Doe*, 484 U.S. 305, 311 (1988); *see M.H. v. N.Y. City Dep't of Educ.*, 685 F.3d 217, 224 (2d Cir. 2012) (describing IEPs in detail).

Kansas has codified its IDEA obligations in state law. *See* Kan. Stat. Ann. § 72-3403 *et seq.*; K.A.R. § 91-40-48. Under Kansas law, the parent of a child with an IEP must "require such child to attend school to receive the special education and related services which are indicated on the child's IEP or . . . provide for such services privately." Kan. Stat. Ann. § 72-3421. That is, parents of children with IEPs must ensure that *someone* provides their child's IEP services. *See id*; K.A.R. § 91-40-48(b).

The IEP services that Kansas provides are secular, devoid of any religious teachings. In particular, state law declares that "[n]o special education services shall be provided in connection with religious courses, devotional exercises, religious training, or any other religious activity." Kan. Stat. Ann. § 72-3463. A related regulation, K.A.R. 91-40-48, requires that special education services "to exceptional children enrolled in private schools [be] provided in a secular and nonideological manner."

**2.** Baker and her son S.B. live within the geographical boundaries of the Blue Valley School District in Kansas. Doc. 118 at ¶ 2.a.ii. Baker is a Christian, and it is her position that S.B. "has an educational need

---

[1] All references to the parties' briefs are to the page numbers assigned by CM/ECF. All facts are uncontroverted unless otherwise specified.

to learn about God and the Christian Gospel of Jesus Christ as the Messiah for all mankind." Doc. 127 at ¶ 5.

During the 2018-2019 and 2019-2020 school years, S.B. attended kindergarten at Wolf Springs Elementary in the Blue Valley school district. Doc. 118 at ¶ 2.a.v. Around May 2018, S.B. received an IEP. *Id.* at ¶ 2.a.vi. Blue Valley personnel provided secular special education services to S.B. while he attended Wolf Springs Elementary. Doc. 120 at ¶¶ 7, 8. Baker did not object to the special education that S.B. received at Wolf Springs, and she did not request any religious instruction for S.B. *Id.* at ¶¶ 9, 10.

S.B. did not return to a Blue Valley school for the 2020-2021 school year. Doc. 120 at ¶ 13. Baker told Blue Valley that she would not send S.B. to a Blue Valley school because she opposed the masking rules that Blue Valley had implemented to combat COVID-19. *Id.* at ¶ 14. She informed Blue Valley that her family would educate S.B. at home. *Id.* at ¶ 16. Blue Valley then sent Baker a letter informing her that it was Blue Valley's understanding that S.B. had withdrawn from the district and would be homeschooled, that S.B. was therefore unenrolled from Blue Valley, and that Blue Valley "stands ready, willing, and able to continue special education services as outlined on S.B.'s IEP." Doc. 120-2 at 11; Doc. 120 at ¶ 17. Baker homeschooled S.B. for the 2020-2021 school year. Doc. 120 at ¶ 21. S.B. also attended Wild Wilderness Kids Therapeutic Nature Center, a secular school, in the 2020-2021 school year. *Id.* at ¶¶ 21, 24, 25.

In March 2023, Baker filed a Notice of Parent's Request for a Special Education Due Process Hearing. Doc. 120 at ¶ 48. This Notice initiated a due process proceeding under IDEA in which Baker raised the same claims as in this litigation. Doc. 120-4 at 15–22. The Due Process Hearing Officer dismissed the Notice because it was impermissibly vague. Doc. 120 at ¶ 49. Baker appealed to an Administrative Law Judge, who upheld the Hearing Officer's decision. *Id.* at ¶ 50.

**3.** The next month, Baker and other plaintiffs filed this suit against several defendants, challenging the aforementioned restrictions in K.S.A. § 72-3463 and K.A.R. § 91-40-48. Doc. 1. Initially, the number of plaintiffs, the number of defendants, and the claims at issue were wide and varied. But the claims and litigants have been winnowed

down significantly.[2] Baker is the only remaining plaintiff and Schmidt the only remaining defendant. *See* Doc. 109 (order dismissing certain claims and defendants). As Assistant Superintendent for Special Education at Blue Valley, Schmidt is responsible for implementing the Kansas statutes that Baker challenges, and Baker sued him in his official capacity. Doc. 120 at 1 n.1; Doc. 122 at ¶ 16.

Baker has four remaining claims against Schmidt. Doc. 118 at ¶ 4.a. Count I alleges that Blue Valley violated the First Amendment's Free Exercise Clause by excluding Baker from government benefits. *Id.*; Doc. 127 at 6. Specifically, Baker argues that Blue Valley forces her to choose between receiving special education services and exercising her religious beliefs. Doc. 127 at 6. Count II also alleges a violation of the Free Exercise Clause. Doc. 118 at ¶ 4.a.; Doc. 127 at 7. Baker argues that Blue Valley discriminates against religious students like S.B. who "cannot have an IEP designed to meet all of his educational needs which include morality and religion." Doc. 127 at 6. Count IV turns to the Equal Protection Clause of the Fourteenth Amendment. Doc. 118 at ¶ 4.a.; Doc. 127 at 7. Similar to Count II, Baker alleges that Blue Valley treats religious students worse than non-religious students. Doc. 127 at 7. Finally, Count V returns to the Free Exercise Clause. Doc. 118 at ¶ 4.a.; Doc. 127 at 7. Baker argues that Blue Valley impermissibly requires her to forgo her religious convictions in order to obtain special education services for S.B. Doc. 127 at 7.

Both sides now move for summary judgment. Docs. 119 & 121. Among other things, Blue Valley argues that Baker lacks standing because she has not identified an injury in fact, causation, or redressability. Doc. 120 at 13. Baker also requests summary judgment, arguing that Blue Valley's special education framework violates the Constitution. *See generally* Doc. 122.

## II

Baker asserts four constitutional claims concerning the implementation of special education services to her son. But she has failed to carry her burden of establishing that Schmidt's actions as Blue Valley's Special Education Assistant Superintendent caused her to suffer an injury in fact, leaving her without standing to pursue these claims. As a

---

[2] For a more fulsome exposition of the procedural history, see Doc. 109.

result, Schmidt's motion for summary judgment is granted, and Baker's is denied as moot.

## A

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting U.S. Const. art. III, § 2, cl. 1.); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "For there to be a case or controversy under Article III, the plaintiff must have . . . standing." *TransUnion*, 594 U.S. at 423. "Regardless of the stage of litigation at which [federal courts evaluate] standing, the standing inquiry remains focused on whether the party invoking jurisdiction had a sufficient stake in the outcome when the suit was filed." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1162 (10th Cir. 2023). Plaintiffs "must demonstrate standing separately for each form of relief sought." *WildEarth Guardians v. Pub/.Serv. Co. of Colo.*, 690 F.3d 1174, 1182 (10th Cir. 2012) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Serv. (TOC), Inc.*, 528 U.S. 167, 185 (2000)) (internal quotation marks omitted).

Standing requires a plaintiff to have "suffered an injury in fact" that is "fairly traceable to the challenged action of the defendant" and is likely to be "redressed by a favorable decision." *Laufer v. Looper*, 22 F.4th 871, 876 (10th Cir. 2022) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "These requirements ensure that 'the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction.'" *Looper*, 22 F.4th at 876 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

The injury in fact must be "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). For an injury to be concrete, it must be "real" rather than "abstract," but not necessarily "tangible." *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1190–91 (10th Cir. 2021). In other words, "it must actually exist." *Spokeo*, 578 U.S. at 340. And "[a] statutory violation does not necessarily establish injury in fact." *Looper*, 22 F.4th at 876 (explaining that *Spokeo* and *TransUnion* recently clarified that fact). "For an injury to be particularized, it 'must affect the plaintiff in a personal and individual way.'" *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1); *see also Spokeo*, 578 U.S. at 339. "[A]ctual or imminent [means] that the injury must have already occurred or be likely to occur soon." *Food & Drug Admin. v. All. for*

*Hippocratic Med.*, 602 U.S. 367, 381 (2024). And "[a]n alleged future injury is sufficiently imminent 'if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Looper*, 22 F.4th at 876 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

As to causation, the plaintiff must show that "its injury is 'fairly traceable to the challenged action'" of the defendant. *Rocky Mountain Peace & Just. Ctr. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 1133, 1152 (10th Cir. 2022) (quoting *Friends of the Earth*, 528 U.S. at 180). For Article III purposes, that means "proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005). To make that showing, "plaintiffs bear the burden of pleading and proving concrete facts showing that the defendant's *actual action* has caused the [harm or a] substantial risk of harm." *Rocky Mountain Peace & Just. Ctr.*, 40 F.4th at 1152 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)) (quotation marks omitted).

Regarding redressability, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Atlas Biologicals, Inc. v. Kutrubes*, 50 F.4th 1307, 1325 (10th Cir. 2022) (quoting *Lujan*, 504 U.S. at 560) (internal quotation marks omitted). In other words, "a party must show that a favorable court judgment is likely to relieve the party's injury." *WildEarth*, 690 F.3d at 1182 (quoting *City of Hugo v. Nichols (Two Cases)*, 656 F.3d 1251, 1264 (10th Cir. 2011)). "The plaintiff must show that a favorable judgment will relieve a discrete injury, although it need not relieve his or her every injury." *WildEarth*, 690 F.3d at 1182 (quoting *Nova Health Sys.*, 416 F.3d at 1158).

And finally, when assessing standing, federal courts are not to "open the door to merits considerations at the jurisdictional stage." *Smith v. Albany Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 121 F.4th 1374, 1378 (10th Cir. 2024) (internal quotation marks omitted). Thus, "[f]or purposes of standing, [courts] must assume the Plaintiffs' claim has legal validity." *COPE v. Kan. State Bd. of Educ.*, 821 F.3d 1215, 1220 (10th Cir. 2016) (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1092–93 (10th Cir. 2006) (en banc)). In other words, "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

**B**

Baker does not affirmatively state in any of her summary judgment pleadings what her injury is. *See generally* Docs. 122, 127, 128. At best, Baker makes a number of cursory and conclusory statements about her belief that she and/or S.B. have been wronged by a law (or laws) that she believes are unconstitutional.[3] *See, e.g.*, Doc. 122 at 16 (noting that "[Baker] and S.B. are captive to the Kansas statutory obligation to provide Special Education services to S.B., [which] is a profound burden to [Baker's] First Amendment rights and an injury."); Doc. 122 at 36 ("S.B. is injured because he has not received [special education benefits] and in the manner required. S.B. is also injured because Blue Valley targets S.B. and his religious curriculum for disfavored treatment."); Doc. 127 at 31 (arguing that "[Baker] is not required to engage in a futile and meaningless request to [Blue Valley] for it to do something it has declared it will never do . . . . That is a controversy and injury to [Baker] and S.B.").

These complaints are unsupported by facts. That is a problem because generalized grievances or concerns about the constitutionality of a law are insufficient to confer standing. *Hays*, 515 U.S. at 743 ("[W]e have repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power."). Instead, a plaintiff must allege—and at the summary judgment stage must establish with proof—that he or she has suffered a concrete, redressable injury. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, (1990) (finding no standing where the plaintiff relied on conclusory allegations); *MacArthur v. San Juan Cnty.*, 495 F.3d 1157, 1160–61 (10th Cir. 2007) ("Mere conclusory allegations with no

---

[3] While Schmidt offers a robust demonstration that Baker lacks standing because she has not identified an injury in fact, Baker's response brief never directly confronts that contention by identifying what concrete harm or harms she suffered that are or were caused by Schmidt's implementation of Kansas law. *Compare* Doc. 120 at 13 (arguing that Baker "has not actually sustained the injury in fact that allegedly supplies her standing"); *with* Doc. 127 at 27 (asserting that "[t]here are multiple injuries at work," but failing to clearly explain what they are, whether Baker has actually sustained them, and how Schmidt and/or Blue Valley caused them). That failure has made it difficult to meaningfully discern exactly what Baker's position is and why she believes she has standing. *See Murthy v. Missouri*, 603 U.S. 43, 49 (2024) (noting that plaintiffs bear the burden of establishing standing).

citations to the record or any legal authority for support does not constitute adequate briefing.") (quotation marks omitted).

Baker's claims fail because she points to no evidence when faced with the famous standing question: "What's it to you?" Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U.L. REV. 881, 882 (1983); *see also TransUnion*, 594 U.S. at 423 (noting that plaintiffs must answer Justice Scalia's question in order to "demonstrate their personal stake" in the suit). And as a result, a federal court may not entertain the substance of her claims. *Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 543–44 (10th Cir. 2016).

Contrasting the summary judgment evidence with the facts assumed to be true at the motion-to-dismiss stage illuminates Baker's lack of standing. Previously, Baker was found to have standing at the motion-to-dismiss stage because the well-pleaded facts, accepted as true, plausibly alleged that Blue Valley, applying the Kansas law that Baker challenges, concluded that S.B. was ineligible for special education services. *See* Doc. 109 at 15 (citing Doc. 13 at ¶ 16). Discovery, however, has failed to support that allegation: The undisputed facts in the record establish that Baker has never requested that Blue Valley provide S.B. with special education services at his current non-Blue Valley school. Doc. 120 at ¶ 33; Doc. 127 (failing to controvert). Nor has she ever requested that Blue Valley provide S.B. with any religious instruction. Doc. 120 at ¶ 38; Doc. 127 at ¶ 38 (admitting the same). Indeed, she wants someone other than Blue Valley to provide S.B. with religious instruction. Doc. 120 at ¶ 41 (admitted statement of fact that Baker does not want S.B.'s special education services to include religious teachings); *but see* Doc. 127 at ¶ 43 (noting that Baker "wants S.B. to have a curriculum that includes religion"). These facts, contrary to what Baker alleged in her Complaint, confirm that Blue Valley did not deny S.B. special education services at all, much less in violation of either the First or Fourteenth Amendments to the Constitution.

Baker attempts to avoid this result by asserting a new injury. In particular, she suggests that she was injured because Kansas will not give S.B. special education benefits at home or at a private religious school while he receives a religious curriculum. *See* Doc. 127 at ¶ 38. That argument has several failings.

For one thing, it is speculation at best. The uncontroverted facts establish that Baker never made such a request. Doc. 120 at ¶¶ 22, 33, 38; Doc. 120-1 at 18 (Baker's admission in her deposition that she has

never asked Blue Valley to provide special education services to S.B. at his current private school). And there are no facts offered to support her claim. Speculation at the summary judgment stage will not do. *Lujan*, 504 U.S. at 567 (rejecting the plaintiff's alleged injury because it was "pure speculation"); *Schutz v. Thorne*, 415 F.3d 1128, 1135 (10th Cir. 2005) (finding that the plaintiff had no standing to challenge a statute when he had not yet been affected by the statute, and noting that "[s]tanding is not conferred by conjecture or speculation") (quotation marks omitted).

And for another, alleged futility cannot establish standing. *Contra* Doc. 127 at 31. As the Supreme Court long ago observed, futility is not enough to establish an imminent, concrete injury. *See Lujan*, 504 U.S. 564; *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 875 (10th Cir. 2020) (rejecting the argument that it would be futile to make a request because the plaintiff believes she is "automatically disqualified").

And finally, it has been waived. Baker has not previously identified such a theory of standing and has not shown that it was viable since the outset of this suit. *See Carney v. Adams*, 592 U.S. 53, 59 (2020) (noting that the plaintiff "bears the burden of establishing standing as of the time he brought this lawsuit and maintaining it thereafter"); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 286 n.57 (3d Cir. 2014) ("A plaintiff may not effectively amend its complaint by raising a new theory of standing in its response to a motion for summary judgment. Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.") (quotation marks omitted).

### III

For the foregoing reasons, Schmidt's Motion for Summary Judgment, Doc. 119, is GRANTED, and Baker's Motion for Summary Judgment, Doc. 121, is DENIED as moot.

It is so ordered.

Date: July 22, 2025                     s/ Toby Crouse
                                        Toby Crouse
                                        United States District Judge

**In the United States District Court
for the District of Kansas**

———————————

Case No. 5:23-cv-04022-TC

———————————

TERRI E. BAKER,

*Plaintiff*

v.

MARK SCHMIDT,

*Defendant*

———————————

**JUDGMENT IN A CIVIL CASE**

☐   Jury Verdict. This action came before the Court for a jury trial. The issues have been tried and the jury has rendered its verdict.

☒   Decision by the Court. This action came before the Court. The issues have been considered and a decision has been rendered.

**Pursuant to the Court's Memorandum and Order filed on July 22, 2025, this case is dismissed in favor of Defendant Mark Schmidt.**

Date:  July 22, 2025          SKYLER B. O'HARA
                             CLERK OF THE DISTRICT COURT

                             By:   s/  Traci Anderson
                                     Deputy Clerk

Purposes -

(1) The purposes of this chapter are:

(A) to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living.

In General -

A State is eligible for assistance under this part for a fiscal year if the State demonstrates to the satisfaction of the Secretary that the State has in effect policies and procedures to ensure that:

(1)(A) A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school.

(B) The obligation to make a free appropriate public education available to all children with disabilities does not apply with respect to children:

(i) aged 3 through 5 and 18 through 21 in a State to the extent that its application to those children would be inconsistent with State law or practice, or the order of any court, respecting the provision of public education to children in those age ranges; and

(ii) aged 18 through 21 to the extent that State law does not require that special education and related services under this part be provided to children with disabilities who, in the educational placement prior to their incarceration in an adult correctional facility, were not actually identified as being a child with a disability under section 1401 of this title or did not have an individualized education program under this subchapter.

Children placed in, or referred to, private schools by public agencies -

(i) In general. Children with disabilities in private schools and facilities are provided special education and related services, in accordance with an individualized education program, at no cost to their parents, if such children are placed in, or referred to, such schools or facilities by the State or appropriate local educational agencies as the means of carrying out the requirements of this subchapter or any other applicable law requiring the provision of special education and related services to all children with disabilities within such State.

(ii) Standards. In all such cases, the State educational agency shall ensure that:

(I) the children served have all the rights they would have if served by such agencies;

(II) the State educational agency meets the standards that apply to education provided by such agency and educational institutions; and

(III) the children served by such agency or educational institution have the same rights under this subchapter as children served by public agencies.

§ 300.199 State administration.

(a) Rulemaking. Each State that receives funds under Part B of the Act must—

(1) Ensure that any State rules, regulations, and policies relating to this part conform to the purposes of this part;

(2) Identify in writing to LEAs located in the State and the Secretary any such rule, regulation, or policy as a State-imposed requirement that is not required by Part B of the Act and Federal regulations; and

(3) Minimize the number of rules, regulations, and policies to which the LEAs and schools located in the State are subject under Part B of the Act.

(b) Support and facilitation. State rules, regulations, and policies under Part B of the Act must support and facilitate LEA and school-level system improvement designed to enable children with disabilities to meet the challenging State student academic achievement standards.

§ 300.320 Definition of individualized education program.

(a) General.  As used in this part, the term individualized education program or IEP means a written statement for each child with a disability that is developed, reviewed, and revised in a meeting in accordance with §§ 300.320 through 300.324, and that must include—

(1) A statement of the child's present levels of academic achievement and functional performance, including—

(i) How the child's disability affects the child's involvement and progress in the general education curriculum (i.e., the same curriculum as for nondisabled children); or

(ii) For preschool children, as appropriate, how the disability affects the child's participation in appropriate activities;

(2)

(i) A statement of measurable annual goals, including academic and functional goals designed to—

(A) Meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and

(B) Meet each of the child's other educational needs that result from the child's disability;

(ii) For children with disabilities who take alternate assessments aligned to alternate academic achievement standards, a description of benchmarks or short-term objectives;

(3) A description of—

(i) How the child's progress toward meeting the annual goals described in paragraph (2) of this section will be measured; and

(ii) When periodic reports on the progress the child is making toward meeting the annual goals (such as through the use of quarterly or other periodic reports, concurrent with the issuance of report cards) will be provided;

**91-40-27. Parental consent**. (a) Except as otherwise provided in this regulation, each agency shall obtain parental consent before taking any of the following actions:

(1) Conducting an initial evaluation or any reevaluation of an exceptional child;

(2) initially providing special education and related services to an exceptional child; or

(3) making a material change in services to, or a substantial change in the placement of, an exceptional child, unless the change is made under the provisions of K.A.R. 91-40-33 through 91-40-38 or is based upon the child's graduation from high school or exceeding the age of eligibility for special education services.

(b) When screening or other methods used by an agency indicate that a child may have a disability and need special education services, the agency shall make reasonable and prompt efforts to obtain informed consent from the child's parent to conduct an initial evaluation of the child and, if appropriate, to make the initial provision of services to the child.

(c) Unless a judicial order specifies to the contrary, each agency shall recognize the biological or adoptive parent of an exceptional child who is a minor as the educational decision maker for the child if the parent exerts the parent's rights on behalf of the child, even if one or more other persons meet the definition of parent for the particular child.

(d) An agency shall not construe parental consent for initial evaluation as consent for the initial provision of special education and related services to an exceptional child.

(e) An agency shall not be required to obtain parental consent before taking either of the following actions:

(1) Reviewing existing data as part of an evaluation, reevaluation, or functional behavioral assessment; or

(2) administering a test or other evaluation that is administered to all children, unless before administration of that test or evaluation, consent is required of the parents of all children.

(f)(1) If a parent of an exceptional child who is enrolled or is seeking to enroll in a public school does not provide consent for an initial evaluation or any reevaluation, or for a proposed material change in services or a substantial change in the placement of the parent's child, an agency may, but shall not be required to, pursue the evaluation or proposed change by initiating due process or mediation procedures.

(2) If a parent of an exceptional child who is being homeschooled or has been placed in a private school by the parent does not provide consent for an initial evaluation or a reevaluation, or fails to respond to a request to provide consent, an agency shall not pursue the evaluation or reevaluation by initiating mediation or due process procedures.

(3) An agency shall not be in violation of its obligations for identification, evaluation, or reevaluation if the agency declines to pursue an evaluation or reevaluation because a parent has failed to provide consent for the proposed action.

(4) Each agency shall document its attempts to obtain parental consent for action proposed under this regulation.

(g) An agency shall not be required to obtain parental consent for a reevaluation or a proposed change in services or placement of the child if the agency has made attempts, as described in K.A.R. 91-40-17(e)(2), to obtain consent but the parent or parents have failed to respond.

(h) An agency shall not use a parent's refusal to consent to an activity or service to deny the parent or child other activities or services offered by the agency.

(i) If, at any time after the initial provision of special education and related services, a parent revokes consent in writing for the continued provision of all special education, related services, and supplementary aids and services, the following shall apply:

(1) The agency shall not continue to provide special education, related services, and supplementary aids and services to the child but shall provide prior written notice in accordance with K.A.R. 91-40-26 before ceasing the provision of those services.

(2)The agency shall not use the procedures in K.S.A. 72-972a or K.S.A. 72-996, and amendments thereto, or K.A.R. 91-40-28, including the mediation procedures and the due process procedures, in order to obtain an agreement or a ruling that the services may be provided to the child.

(3)The agency shall not be considered to be in violation of the requirement to make FAPE available to the child because of the failure to provide the child with further special education services, related services, and supplementary aids and services.

(4)The agency shall not be required to convene an IEP team meeting or develop an IEP under K.S.A. 72-987, and amendments thereto, or K.A.R. 91-40-16 through K.A.R. 91-40-19 for the child for further provision of special education, related services, and supplementary aids and services.

(j)If a parent revokes consent in writing for the child's receipt of all special education and related services after the child is initially provided special education and related services, the agency shall not be required to amend the child's education records to remove any references to the child's receipt of special education and related services because of the revocation of consent.

(k)If a parent revokes consent for the continued provision of particular special education, related services, supplementary aids and

services, or placements, or any combination of these, and the IEP team certifies in writing that the child does not need the service or placement for which consent is being revoked in order to receive a free appropriate public education, the following shall apply:

(1) The agency shall not continue to provide the particular special education, related services, supplementary aids and services, and placements for which consent was revoked but shall provide prior written notice in accordance with K.A.R. 91-40-26 before ceasing the provision of the particular special education, related services, supplementary aids and services, and placements.

(2) The agency shall not be considered to be in violation of the requirement to make FAPE available to the child because of the failure to provide the child with the particular special education, related services, supplementary aids and services, or placements, or any combination, for which parental consent was revoked.

(l)If a parent who revoked consent for all special education, related services, and supplementary aids and services under subsection (i) subsequently requests that the person's child be reenrolled in special education, the agency shall conduct an initial evaluation of the child to determine whether the child qualifies for special education before reenrolling the child in special education. If the team evaluating the child determines that no additional data are needed to make any of the determinations specified in K.A.R. 91-40-8(c)(2), the agency shall give written notice to the child's parent in accordance with K.A.R. 91-40-8(e)(2). If the child is determined to be eligible, the agency shall develop an initial IEP. (Authorized by K.S.A. 2008 Supp. 72-963; implementing K.S.A. 2008 Supp. 72-988; effective May 19, 2000; amended May 4, 2001; amended March 21, 2008; amended July 23, 2010.)

Printable Format

## Agency 91

### State Department of Education

Article 40.—Special Education

Printable Format

**91-40-43. Services to private school children**. (a) Consistent with the number and location of private school children in the school district, each board shall provide special education and related services to this group of children in accordance with K.A.R. 91-40-43 through 91-40-48.

Each board also shall provide services to gifted children who reside in the district and are enrolled in a private school.

(b) The parent of an exceptional child may request that the child be provided special education and related services in accordance with K.S.A. 72-5393 and amendments thereto.

(c) A board shall not be required to provide any special education or related services to a private school child unless one of the following conditions is met:

(1) The child is a member of a group of private school children that has been designated to receive special education and related services in accordance with the provisions of K.A.R. 91-40-43 through 91-40-48.

(2) The parent of the child requests that services be provided to the child in accordance with K.S.A. 72-5393 and amendments thereto.

(d) Except as otherwise provided in K.S.A. 72-5393 and amendments thereto, a private school child shall not be entitled to receive any special education or related service that the child would be entitled to receive if enrolled in a public school, and a private school child may receive a different amount of special education or related services than a child with a disability who is enrolled in a public school.

(e) Each board shall ensure that the special education and related services provided to private school children are provided by personnel who meet the same standards as the standards for public school personnel, except that private school teachers who provide services to private school children shall not be required to be highly qualified under the federal law. (Authorized by K.S.A. 2007 Supp. 72-963; implementing K.S.A. 2007 Supp. 72-966 and 72-5393; effective May 19, 2000; amended March 21, 2008.)

Printable Format

An official State of Kansas government website. Here's how you know.

## Agency 91

### State Department of Education

Article 40.—Special Education

Printable Format

**91-40-48. Use of funds and equipment**. (a) Subject to subsection (d), an agency may use state and federal funds to make personnel available at locations other than at its facilities to the extent necessary to provide special education and related services to exceptional children enrolled in private schools, if those services are not normally provided by the private schools.

(b) Subject to subsection (d), an agency may use state and federal funds to pay for the services of an employee of a private school to provide special education and related services if both of the following conditions are met:

(1) The employee performs the services outside of the employee's regular hours of duty.

(2) The employee performs the services under public supervision and control.

(c) (1) Subject to subsection (d), an agency may use state and federal funds to provide for the special education and related services needs of exceptional children enrolled in private schools, but shall not use those funds for either of the following purposes:

(A) To enhance the existing level of instruction in the private school or to otherwise generally benefit the private school; or

(B) to generally benefit the needs of all students enrolled in the private school.

(2) Each agency shall ensure that special education and related services provided to exceptional children enrolled in private schools are provided in a secular and nonideological manner.

(d) An agency's authority to use federal funds under this regulation shall be limited to providing special education and related services to children with disabilities.

(e) An agency shall not offer or maintain classes that are organized separately on the basis of public or private school enrollment or the religion of the students, if the classes offered to students are provided at the same site and the classes include students enrolled in a public school and students enrolled in a private school.

(f) (1) An agency shall keep title to, and exercise continuing administrative control over, all property, equipment, and supplies that are acquired by the agency to be used for the benefit of exceptional children enrolled in private schools.

(2) An agency may place equipment and supplies in a private school, to the extent allowed by law, for the period of time needed to provide special education and related services to exceptional children enrolled in the school.

(g) (1) An agency shall ensure that any equipment or supplies placed in a private school are used to provide special education and related services and can be removed from the private school without the necessity of remodeling the private school.

(2) An agency shall remove its equipment or supplies from a private school if either of the following conditions exists:

(A) The equipment or supplies are no longer needed to provide special education or related services to students enrolled in the private school.

(B) Removal is necessary to avoid unauthorized use of the equipment or supplies.

(h) An agency shall not use public funds to construct, remodel, or repair any private school facility. (Authorized by K.S.A. 2007 Supp. 72-963; implementing K.S.A. 2007 Supp. 72-966; effective May 19, 2000; amended March 21, 2008.)

Printable Format

# 2024 Kansas Statutes

**72-3120. Compulsory school attendance; exemptions.** (a) Subject to the other provisions of this section, every parent or person acting as parent in the state of Kansas, who has control over or charge of any child who has reached the age of seven years and is under the age of 18 years and has not attained a high school diploma, a general educational development credential or a high school equivalency credential, shall require such child to be regularly enrolled in and attend continuously each school year:

(1) A public school for the duration of the school term provided for in K.S.A. 72-3115, and amendments thereto;

(2) a private, denominational or parochial school taught by a competent instructor for a period of time which is substantially equivalent to the period of time public school is maintained in the school district in which the private, denominational or parochial school is located; or

(3) a combination of a public school and a private, denominational or parochial school for the periods of time referred to in paragraphs (1) and (2).

(b) If the child is 16 or 17 years of age, the child shall be exempt from the compulsory attendance requirements of this section if:

(1) The child is regularly enrolled in and attending a program recognized by the local board of education as an approved alternative educational program;

(2) the parent or person acting as parent provides written consent to allow the child to be exempt from the compulsory attendance requirements of this section and the child and the parent or person acting as parent attend a final counseling session conducted by the school during which a disclaimer to encourage the child to remain in school or to pursue educational alternatives is presented to and signed by the child and the parent or person acting as parent. The disclaimer shall include information regarding the academic skills that the child has not yet achieved, the difference in future earning power between a high school graduate and a high school drop out and a listing of educational alternatives that are available for the child;

(3) the child is regularly enrolled in a school as required by subsection (a) and is concurrently enrolled in a postsecondary educational institution, as defined by K.S.A. 74-3201b, and amendments thereto; or

(4) the child is subject to a court order that allows or requires the child to be exempt from the compulsory attendance requirements.

(c) Any child who is under the age of seven years, but who is enrolled in school, shall be subject to the compulsory attendance requirements of this section. Any such child may be withdrawn from enrollment in school at any time by a parent or person acting as parent of the child and thereupon the child shall be exempt from the compulsory attendance requirements of this section until the child reaches the age of seven years or is re-enrolled in school.

(d) Any child who is determined to be an exceptional child, except for an exceptional child who is determined to be a gifted child, under the provisions of the special education for exceptional children act shall be subject to the compulsory attendance requirements of such act and exempt from the compulsory attendance requirements of this section.

(e) Any child who has been admitted to, and is attending, the Kansas academy of mathematics and science, as provided in K.S.A. 72-3903 et seq., and amendments thereto, shall be exempt from the compulsory attendance requirements of this section.

(f) No child attending public school in this state shall be required to participate in any activity which is contrary to the religious teachings of the child if a written statement signed by one of the parents or a person acting as parent of the child is filed with the proper authorities of the school attended requesting that the child not be required to participate in such activities and stating the reason for the request.

(g) When a recognized church or religious denomination that objects to a regular public high school education provides, offers and teaches, either individually or in cooperation with another recognized church or religious denomination, a regularly supervised program of instruction that is approved by the state board of education,

for children of compulsory school attendance age who have successfully completed the eighth grade, participation in such a program of instruction by any such children whose parents or persons acting as parents are members of the sponsoring church or religious denomination shall be regarded as acceptable school attendance within the meaning of this act. Approval of such programs shall be granted by the state board of education, for two-year periods, upon application from recognized churches and religious denominations, under the following conditions:

(1)   Each participating child shall be engaged, during each day on which attendance is legally required in the public schools in the school district in which the child resides, in at least five hours of learning activities appropriate to the adult occupation that the child is likely to assume in later years;

(2)   acceptable learning activities, for the purposes of this subsection, shall include projects supervised by a parent or person acting as parent in agriculture and homemaking, work-study programs in cooperation with local business and industry and correspondence courses from schools accredited by the national home study council, recognized by the United States office of education as the competent accrediting agency for private home study schools;

(3)   at least 15 hours per week of classroom work under the supervision of an instructor shall be provided, at which time students shall be required to file written reports of the learning activities they have pursued since the time of the last class meeting, indicating the length of time spent on each one, and the instructor shall examine and evaluate such reports, approve plans for further learning activities and provide necessary assignments and instruction;

(4)   regular attendance reports shall be filed as required by law and students shall be reported as absent for each school day on which they have not completed the prescribed minimum of five hours of learning activities;

(5)   the instructor shall keep complete records concerning instruction provided, assignments made and work pursued by the students, and these records shall be filed on the first day of each month with the state board of education and the board of education of the school district in which the child resides;

(6)   the instructor shall be capable of performing competently the functions entrusted thereto; and

(7)   in applying for approval under this subsection a recognized church or religious denomination shall certify its objection to a regular public high school education and shall specify, in such detail as the state board of education may reasonably require, the program of instruction that it intends to provide and no such program shall be approved unless it fully complies with standards specified by the state board of education.

If the sponsors of an instructional program approved under this subsection fail to comply at any time with the provisions of this subsection, the state board of education shall rescind, after a written warning has been served and a period of three weeks allowed for compliance, approval of the programs, even though the two-year approval period has not elapsed, and thereupon children attending such program shall be admitted to a high school of the school district.

(h) (1)   Each board of education of a school district shall allow any child to enroll part-time in the school district to allow the student to attend any courses, programs or services offered by the school district if the child:

(A)   Is also enrolled in a nonaccredited private elementary or secondary school pursuant to K.S.A. 72-4345, and amendments thereto, or in any other private, denominational or parochial school pursuant to the provisions of subsection (a);

(B)   requests to enroll part-time in the school district; and

(C)   meets the age of eligibility requirements for school attendance pursuant to K.S.A. 72-3118, and amendments thereto.

(2)   Each board of education of a school district shall adopt a policy regarding the part-time enrollment of students pursuant to this subsection and shall publish such policy on the school district's website. The board of education of a school district shall make a good faith attempt to accommodate scheduling requests of students enrolling in the school district pursuant to this subsection but shall not be required to make adjustments to accommodate every such request.

(i)   As used in this section:

(1)   "Educational alternatives" means an alternative learning plan for the student that identifies educational programs that are located in the area where the student resides and are designed to aid the student in obtaining a high school diploma, general educational development credential or other certification of completion, such as a career technical education industry certification. Such alternative learning plans may include extended learning opportunities such as independent study, private instruction, performing groups, internships, community service, apprenticeships and online coursework.

(2)   "Parent" and "person acting as parent" mean the same as such terms are defined in K.S.A. 72-3122, and amendments thereto.

(3)   "Regularly enrolled" means enrolled in five or more hours of instruction each school day. For the purposes of subsection (b)(3), hours of instruction received at a postsecondary educational institution shall be counted.

**History:**   L. 1874, ch. 123, § 1; L. 1903, ch. 423, § 1; L. 1919, ch. 272, § 1; L. 1923, ch. 182, § 1; R.S. 1923, 72-4801; L. 1965, ch. 409, § 1; L. 1968, ch. 356, § 1; L. 1969, ch. 316, § 1; L. 1976, ch. 310, § 1; L. 1980, ch. 217, § 3; L. 1984, ch. 263, § 1; L. 1996, ch. 229, § 121; L. 1997, ch. 157, § 1; Revived and amended, L. 2004, ch. 185, § 1; L. 2008, ch. 118, § 1; L. 2012, ch. 76, § 1; L. 2022, ch. 94, § 14; July 1.

## 2024 Kansas Statutes

**72-3421.   Compulsory attendance of exceptional children at school for receipt of services; provision of services privately; nonapplicability to gifted children.** (a) Except as otherwise provided in this section, it shall be the duty of the parent of each exceptional child to require such child to attend school to receive the special education and related services which are indicated on the child's IEP or to provide for such services privately.

(b)   The provisions of subsection (a) do not apply to gifted children or to parents of gifted children.

**History:**   L. 1974, ch. 290, § 18; L. 1980, ch. 216, § 6; L. 1999, ch. 116, § 25; July 1.

# 2024 Kansas Statutes

**72-3429.   Individualized education program or family service plan; contents; development; duties of IEP team; IEP meetings; postsecondary goals; transfer of child during school year.** (a) (1) Except as specified in provision (2), at the beginning of each school year, each agency shall have an individualized education program in effect for each exceptional child.

(2) (A)   In the case of a child with a disability aged three through five and for two year-old children with a disability who will turn age three during the school year, an individualized family service plan that contains the material described in 20 U.S.C. § 1436, and that is developed in accordance with this section, may serve as the IEP of the child if using that plan as the IEP is agreed to by the agency and the child's parents.

(B)   In conducting the initial IEP meeting for a child who was previously served under part C of the federal law, an agency, at the request of the parent, shall send an invitation to attend the IEP meeting to the part C services coordinator or other representatives of the part C system to assist with the smooth transition of services.

(b) (1)   Except as otherwise provided in this section, each IEP of an exceptional child and any amendment or modification of an IEP shall be made by the child's IEP team. Upon agreement of the parent and the agency, an IEP team can meet in person or by alternative means, including telephone conference calls and video conferences.

(2)   A member of a child's IEP team shall not be required to attend an IEP meeting, if the parent of the child and the agency agree that the attendance of such IEP member is not necessary because the IEP member's area of curriculum or related service is not to be discussed or modified at the meeting. The parent's agreement shall be in writing.

(3)   A member of a child's IEP team may be excused from attending an IEP meeting when the meeting is to involve a discussion of, and possibly a modification to, the IEP member's area of the curriculum or related service, if:

(A)   The parent and the agency consent to the excusal;

(B)   the IEP member submits, in writing to the parent and the IEP team, input into the development of the IEP prior to the meeting; and

(C)   the parent's consent to the excusal is in writing.

(4) (A)   After the annual IEP meeting for a school year, the parent of an exceptional child and an appropriate representative of the agency providing services to the child may agree to develop a written document amending or modifying the child's current IEP, without convening an IEP meeting.

(B)   If the parent and agency representative develop a written document amending or modifying a child's current IEP, the document shall be dated and signed by the parent and the agency representative. The parent and the agency shall be provided a copy of the document.

(c)   The IEP for each exceptional child shall include:

(1)   A statement of the child's present levels of academic achievement and functional performance, including: (A) How the child's disability or giftedness affects the child's involvement and progress in the general education curriculum; (B) for preschool children, as appropriate, how the disability affects the child's participation in appropriate activities; and (C) for those children with disabilities who take alternate assessments aligned to alternate achievement standards, a description of benchmarks or short-term objections;

(2)   a statement of measurable annual goals, including academic and functional goals designed to: (A) Meet the child's needs that result from the child's disability or giftedness, to enable the child to be involved in and make progress in the general education or advanced curriculum; and (B) meet each of the child's other educational needs that result from the child's disability or giftedness;

(3)   a description of how the child's progress toward meeting the annual goals will be measured and when periodic reports on the progress the child is making toward meeting the annual goals will be provided, such as through the use of quarterly or other periodic reports issued concurrently with general education report cards;

(4)   a statement of the special education and related services and supplementary

aids, based on peer-reviewed research to the extent practicable, and services to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child: (A) To advance appropriately toward attaining the annual goals; (B) to be involved in and make progress in the general education curriculum in accordance with provision (1) and to participate in extracurricular and other nonacademic activities; and (C) to be educated and participate with other exceptional and nonexceptional children in the activities described in this paragraph;

(5) an explanation of the extent, if any, to which the child will not participate with nonexceptional children in the regular class and in the activities described in provision (4);

(6) (A) a statement of any individual appropriate accommodations that are necessary to measure the academic achievement and functional performance of the child on state and district-wide assessments; and (B) if the IEP team determines that the child shall take an alternate assessment on a particular state or district-wide assessment of student achievement or part of such an assessment, a statement of why the child cannot participate in the regular assessment and why the particular alternate assessment selected is appropriate for the child;

(7) the projected date for the beginning of the services and modifications described in provision (4), and the anticipated frequency, location, and duration of those services and modifications;

(8) (A) beginning at age 14, and updated annually, thereafter: (A) Appropriate measurable postsecondary goals based upon age-appropriate transition assessments related to training, education, employment and where appropriate, independent living skills; and (B) the transition services, including appropriate courses of study, needed to assist the child in reaching the stated postsecondary goals; and (C) beginning at age 16, or younger, if determined appropriate by the IEP team, a statement of needed transition services for the child, including, when appropriate, a statement of the interagency responsibilities or any needed linkages; and

(9) beginning at least one year before the child reaches the age of majority under state law, a statement that the child has been informed of the child's rights, if any, that will transfer to the child on reaching the age of majority as provided in K.S.A. 72-3431, and amendments thereto.

Nothing in this section shall be construed to require: (1) That additional information be included in a child's IEP beyond that which is specifically required by this section; and (2) that an IEP team include information under one component of a child's IEP that is already contained under another component of the IEP.

(d) In developing each child's IEP, the IEP team shall consider:

(1) The strengths of the child and the concerns of the parents for enhancing the education of their child;

(2) the results of the initial evaluation or most recent evaluation of the child;

(3) the academic, developmental and functional needs of the child;

(4) in the case of a child whose behavior impedes the child's learning or that of others, the use of positive behavioral interventions and supports and other strategies to address that behavior;

(5) in the case of a child with limited English proficiency, the language needs of the child as such needs relate to the child's IEP;

(6) in the case of a child who is blind or visually impaired, provide for instruction in Braille and the use of Braille unless the IEP team determines, after an evaluation of the child's reading and writing skills, needs, and appropriate reading and writing media, including an evaluation of the child's future needs for instruction in Braille or the use of Braille, that instruction in Braille or the use of Braille is not appropriate for the child;

(7) the communication needs of the child, and in the case of a child who is deaf or hard of hearing, consider the child's language and communication needs, opportunities for direct communications with peers and professional personnel in the child's language and communication mode, academic level, and full range of needs, including opportunities for direct instruction in the child's language and communication mode; and

(8) whether the child requires assistive technology devices and services.

(e)   The regular education teacher of the child, as a member of the IEP team, to the extent appropriate, shall participate in:

(1)   The development of the IEP of the child, including the determination of appropriate positive behavioral interventions supports, and other strategies and the determination of supplementary aids and services, program modifications, and support for school personnel consistent with this section; and

(2)   except as provided in this section, the review and revision of the child's IEP.

(f)   Each agency shall ensure that the IEP team:

(1)   Reviews the child's IEP periodically, but not less than annually to determine whether the annual goals for the child are being achieved; and

(2)   revises the IEP, as appropriate, to address: (A) Any lack of expected progress toward the annual goals and in the general education curriculum, where appropriate; (B) the results of any reevaluation conducted under this section; (C) information about the child provided by the parents; (D) the child's anticipated needs; or (E) other matters.

(g) (1)   If an exceptional child with a current IEP transfers from one Kansas school district to another during the academic year, the new school district, in consultation with the child's parent, shall provide the child a FAPE, including services comparable to those described in the transferred IEP, until the new school district either adopts the transferred IEP, or develops and implements a new IEP for the child.

(2)   If during the academic year, an exceptional child who has a current IEP transfers from a school district in another state to a Kansas school district, the Kansas school district, in consultation with the child's parent, shall provide the child a FAPE, including services comparable to those described in the transferred IEP, until the Kansas school district either adopts the transferred IEP, or conducts an evaluation of the child, if deemed necessary, and develops and implements a new IEP for the child.

**History:**   L. 1999, ch. 116, § 12; L. 2005, ch. 171, § 14; July 1.

# 2024 Kansas Statutes

**72-3461.   Special education services for exceptional children enrolled in private schools; definitions.** As used in this act:

(a)   "School district" means any public school district organized under the laws of this state.

(b)   "Exceptional children" and "special education services" have the meanings respectively ascribed thereto in K.S.A. 72-3404, and amendments thereto.

(c)   "Private, nonprofit elementary or secondary school" means an organization which regularly offers education at the elementary or secondary level, which is exempt from federal income taxation under section 501 of the federal internal revenue code of 1954, as amended, which conforms to the civil rights act of 1964, and attendance at which satisfies any compulsory school attendance laws of this state.

**History:**   L. 1980, ch. 212, § 1; L. 1999, ch. 116, § 39; July 1.

# 2024 Kansas Statutes

**72-3463.   Same; provision in connection with religious activity prohibited.** No special education services shall be provided in connection with religious courses, devotional exercises, religious training, or any other religious activity.
**History:**   L. 1980, ch. 212, § 3; L. 1999, ch. 116, § 41; July 1.

# 2024 Kansas Statutes

**72-4345.   Nonaccredited private schools; pupil records; definitions.** As used in this act:
(a)   "Private elementary or secondary school" means an organization which regularly offers education at the elementary or secondary level and attendance at which satisfies the compulsory school attendance laws of this state, but which is not accredited by the state board of education.
(b)   "Pupil records" means all records, files and data of pupils who are or have been in attendance at a private elementary or secondary school.
(c)   "Official custodian" means any officer or employee of a private elementary or secondary school who is responsible for the custody and maintenance of pupil records.
**History:**   L. 1982, ch. 286, § 1; July 1.

K.S.A. 75-3702a(c)

Department of Administration; secretary; powers and duties.

(c) The secretary of administration shall appoint such employees as are necessary to carry out the powers and duties of the department. Except as otherwise provided by law, all such employees shall be within the classified service under the Kansas civil service act. The secretary may appoint such unclassified employees as are authorized by law. The secretary shall have the authority to organize the department as deemed necessary and to assign functions to the various divisions and units to promote economy and efficiency in administration.

other institutions and educational interests as may be provided by law. The state board of regents shall perform such other duties as may be prescribed by law.

(c)   Any municipal university shall be operated, supervised and controlled as provided by law.

**History:**  Adopted by convention, July 29, 1859; ratified by electors, Oct. 4, 1859; L. 1861, p. 58; original subject matter stricken and new subject substituted, L. 1966, ch. 10—Spec. Sess.; Nov. 8, 1966.

**§ 3.  Members of state board of education and state board of regents.** (a) There shall be ten members of the state board of education with overlapping terms as the legislature may prescribe. The legislature shall make provision for ten member districts, each comprised of four contiguous senatorial districts. The electors of each member district shall elect one person residing in the district as a member of the board. The legislature shall prescribe the manner in which vacancies occurring on the board shall be filled.

(b)   The state board of regents shall have nine members with overlapping terms as the legislature may prescribe. Members shall be appointed by the governor, subject to confirmation by the senate. One member shall be appointed from each congressional district with the remaining members appointed at large, however, no two members shall reside in the same county at the time of their appointment. Vacancies occurring on the board shall be filled by appointment by the governor as provided by law.

(c)   Subsequent redistricting shall not disqualify any member of either board from service for the remainder of his term. Any member of either board may be removed from office for cause as may be provided by law.

**History:**  Adopted by convention, July 29, 1859; ratified by electors, Oct. 4, 1859; L. 1861, p. 58; original subject matter stricken and new subject substituted, L. 1966, ch. 10—Spec. Sess.; Nov. 8, 1966.

**§ 4.  Commissioner of education.** The state board of education shall appoint a commissioner of education who shall serve at the pleasure of the board as its executive officer.

**History:**  Adopted by convention, July 29,

1859; ratified by electors, Oct. 4, 1859; L. 1861, p. 58; original subject matter stricken and new subject substituted, L. 1966, ch. 10—Spec. Sess.; Nov. 8, 1966.

**§ 5.  Local public schools.** Local public schools under the general supervision of the state board of education shall be maintained, developed and operated by locally elected boards. When authorized by law, such boards may make and carry out agreements for cooperative operation and administration of educational programs under the general supervision of the state board of education, but such agreements shall be subject to limitation, change or termination by the legislature.

**History:**  Adopted by convention, July 29, 1859; ratified by electors, Oct. 4, 1859; L. 1861, p. 59; original subject matter stricken and new subject substituted, L. 1966, ch. 10—Spec. Sess.; Nov. 8, 1966.

**§ 6.  Finance.** (a) The legislature may levy a permanent tax for the use and benefit of state institutions of higher education and apportion among and appropriate the same to the several institutions, which levy, apportionment and appropriation shall continue until changed by statute. Further appropriation and other provision for finance of institutions of higher education may be made by the legislature.

(b)   The legislature shall make suitable provision for finance of the educational interests of the state. No tuition shall be charged for attendance at any public school to pupils required by law to attend such school, except such fees or supplemental charges as may be authorized by law. The legislature may authorize the state board of regents to establish tuition, fees and charges at institutions under its supervision.

(c)   No religious sect or sects shall control any part of the public educational funds.

**History:**  Adopted by convention, July 29, 1859; ratified by electors, Oct. 4, 1859; L. 1861, p. 59; original subject matter stricken and new subject substituted, L. 1966, ch. 10—Spec. Sess.; Nov. 8, 1966.

**§ 7.  Savings clause.** (a) All laws in force at the time of the adoption of this amendment and consistent therewith shall remain in full force and