Clerk of Court
United States Court of Appeals
for the Tenth Circuit
Byron White United States Courthouse
1823 Stout Street
Denver, CO 80257

Re:   25-3149, Baker, et al v. Watson, et al
Dist/Ag docket: 5:23-CV-04022-TC
Letter Of Supplemental Authority Fed. R. App. P. 28(j)

Dear Clerk of Court

Counsel for Appellants respectfully submits *Mirabelli v. Bonta,* 607 U. S. \_\_\_\_ (Mar. 2, 2026) (*per curiam*), decided after the filing of Appellants' Opening Brief. The decision directly addresses standing, parental rights, and the proper scope of *Mahmoud v. Taylor* under the Free Exercise Clause.

**Standing**. The Court held that parents challenging exclusionary state policies "very likely have standing because they are objects of the challenged exclusion policies." Slip op. at 6. Categorical exclusion itself constitutes cognizable injury; no prior request or futile application is required. Appellants are the direct objects of K.S.A. 72-3463, which categorically prohibits IDEA services "in connection with religious activity." That statutory exclusion is the injury. The district court held precisely the opposite — that Appellants lacked standing because they had not requested services that Kansas law categorically forbids (Aplt. Br. at 12 (citing AA6-147)) – and *Mirabelli* forecloses that reasoning. Because the injury arises from the statutory prohibition itself, invalidation of K.S.A. 72-3463 would eliminate the barrier preventing delivery of IDEA services within Appellants' chosen educational setting. That relief directly redresses the standing defect the district court identified — confirming that no futile application is required before Appellants may challenge a categorical prohibition.

**Parental Rights.** *Mirabelli* reaffirmed that parents possess a constitutionally protected right to direct their children's upbringing and education. Slip op. at 5–6. Kansas does more than limit participation; it conditions access to federally guaranteed special-education services on acceptance of government-controlled secular delivery. Parents who maintain religious curricular integration must secure and fund special-education services privately to satisfy their continuing statutory educational obligations. *See* K.S.A. 72-3421. That structure imposes a direct, ongoing burden traceable to the State's categorical prohibition and fully redressable by its invalidation.

**Free Exercise**. *Mirabelli* rejected a narrow reading of *Mahmoud v. Taylor*, confirming that strict scrutiny applies whenever a state policy "substantially interferes" with parental religious guidance, not only to discrete curricular mandates. Slip op. at 4–5. K.S.A. 72-3463's categorical exclusion

of IDEA services from religious settings substantially interferes with Appellants' religiously integrated curriculum, triggering strict scrutiny the State cannot satisfy.

Respectfully submitted,

/s/ Linus L. Baker

Counsel for Appellants

# SUPREME COURT OF THE UNITED STATES

No. 25A810

ELIZABETH MIRABELLI, ET AL. *v.* ROB BONTA, ATTORNEY GENERAL OF CALIFORNIA, ET AL.

ON APPLICATION TO VACATE INTERLOCUTORY STAY ORDER

[March 2, 2026]

PER CURIAM.

Before us is an application to vacate a Court of Appeals order staying a permanent injunction entered by a District Court on behalf of parents and teachers who claim that certain California policies violate their rights under the Free Exercise Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment. The parents object that these policies prevent schools from telling them about their children's efforts to engage in gender transitioning at school unless the children consent to parental notification. The parents also take issue with California's requirement that schools use children's preferred names and pronouns regardless of their parents' wishes. The teachers object to their compelled participation in the implementation of the State's policies.

I

This case began in the United States District Court for the Southern District of California in 2023 when two teachers sued seeking an exemption from their school district's policies regarding students' gender. During litigation, the school district claimed that state law, as interpreted by the California attorney general and Department of Education, required it to adopt these policies. So the teachers added state officials as defendants, and parents of California schoolchildren joined the lawsuit as plaintiffs. Relying on

their own experiences and guidance documents issued by state officials, plaintiffs alleged that California's policies permitted disclosure of a student's gender transitioning at school only if the student consented. Plaintiffs claimed that these policies violated their rights under the Free Exercise Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment.

 Two of the parent plaintiffs, John and Jane Poe, have religious objections to gender transitioning but were not told by their daughter's school when she began to present as a boy and use a male name and male pronouns during her seventh-grade year. In parent-teacher meetings, no one told the Poes about their daughter's transitioning or referred to her using the male name and pronouns that were used at school. At the beginning of their daughter's eighth-grade year, she attempted suicide and was hospitalized. Only then did her parents learn from a doctor that she had gender dysphoria and had been presenting as a boy at school. Just months after being discharged, the Poes' daughter was rehospitalized and held there involuntarily because she was at risk for self-harm. At a new school in ninth grade, she once again began identifying as a boy. Contrary to the Poes' instructions, teachers and school officials continued to use a male name and pronouns for their daughter, citing their obligations under California state law. The Poes have placed their daughter in therapy and obtained psychiatric care for her.

 Like the Poes, plaintiffs John and Jane Doe object to gender transitioning, but since fifth grade, their daughter has sometimes identified as a boy. When their daughter was in seventh grade, the Does confronted the school principal about their daughter's transitioning. They believed the school was using a male name and pronouns for their daughter behind their backs. The principal explained that state law prohibited the school from sharing information about a child's transitioning with the child's parents

without the child's consent. The Does believed that the risk of leaving their daughter in that school was too great, so they transferred their daughter to a new public school because sending her to a private school was financially and logistically infeasible. The Does have also placed their daughter in therapy.

In 2025, defendants asserted that the guidance documents on which plaintiffs had relied were no longer operative and that the claims against certain state defendants should be dismissed as moot. But the State had promulgated a new required training curriculum that similarly directed teachers not to tell parents about their children's gender identity without the children's consent. Defendants then withdrew their mootness argument, and the District Court declined to impose sanctions.

Later, plaintiffs sought classwide relief, and the District Court certified a class with separate subclasses for parents and teachers. One subclass of parents comprises all those who object to the challenged policies, while a separate subclass is limited to those who seek a religious exemption. App. to Emergency Application 90a (App.). Two similar subclasses of teachers were also certified. *Id.*, at 89a–90a.

After discovery, the court granted summary judgment for all plaintiffs and entered a permanent injunction in their favor. The injunction prevents the schools from "misleading" parents about their children's gender presentation at school and their social transitioning efforts. *Id.*, at 24a. It also requires the schools to follow parents' directions regarding their children's names and pronouns. And it compels defendants to include in state-created or approved instructional materials a notice of the rights protected by the injunction.

The Ninth Circuit granted defendants' motion to stay the injunction pending appeal. It began by raising procedural objections to the District Court's injunction. It claimed that the District Court had granted class certification without

undertaking the "'rigorous analysis'" required by Federal Rule of Civil Procedure 23. App. 7a (quoting *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U. S. 338, 351 (2011)). And it stated that the injunction appeared to be overly broad because it "covers every parent of California's millions of public school students and every public school employee in the state." App. 6a. As a result, it opined, the injunction seemed to grant relief to uninjured class members who lacked Article III standing.

The Ninth Circuit also expressed doubts about the District Court's decision on the merits. On the free exercise issue, it relied on a not-precedential Sixth Circuit decision and brushed aside *Mahmoud* v. *Taylor*, 606 U. S. 522 (2025), as "a narrow decision focused on uniquely coercive 'curricular requirements.'" App. 10a–11a (citing *Doe No. 1* v. *Bethel Local School Dist. Bd. of Educ.*, 2025 WL 2453836, *7 (CA6, Aug. 26, 2025)). The Ninth Circuit expressed skepticism about the parents' and teachers' Fourteenth Amendment due process claim because it viewed those claims as seeking to expand the protection afforded by established precedent.

When the Ninth Circuit stayed the injunction, the parents and teachers filed this application seeking vacatur of the Ninth Circuit's stay pending appeal.

II

We grant the application and vacate the stay with respect to the parents because this aspect of the stay is not "justified under the governing four-factor test." *Alabama Assn. of Realtors* v. *Department of Health and Human Servs.*, 594 U. S. 758, 763 (2021) (*per curiam*) (citing *Nken* v. *Holder*, 556 U. S. 418, 434 (2009)).

*Likelihood of success on the merits*. We conclude that the parents who seek religious exemptions are likely to succeed on the merits of their Free Exercise Clause claim. California's policies likely trigger strict scrutiny under that

provision because they substantially interfere with the "right of parents to guide the religious development of their children." *Mahmoud*, 606 U. S., at 559 (citing *Wisconsin* v. *Yoder*, 406 U. S. 205 (1972)). The parents who assert a free exercise claim have sincere religious beliefs about sex and gender, and they feel a religious obligation to raise their children in accordance with those beliefs. California's policies violate those beliefs and "impos[e] the kind of burden on religious exercise that *Yoder* found unacceptable." 606 U. S., at 550. Indeed, the intrusion on parents' free exercise rights here—unconsented facilitation of a child's gender transition—is greater than the introduction of LGBTQ storybooks we considered sufficient to trigger strict scrutiny in *Mahmoud*. See *id.*, at 563.

California's policies will likely not survive the strict scrutiny that *Mahmoud* demands. The State argues that its policies advance a compelling interest in student safety and privacy. But those policies cut out the primary protectors of children's best interests: their parents. See *Troxel* v. *Granville*, 530 U. S. 57, 68–69 (2000) (plurality opinion). California's policies also appear to fail the narrow-tailoring requirement. The State's interest in safety could be served by a policy that allows religious exemptions while precluding gender-identity disclosure to parents who would engage in abuse. For these reasons, the parents who object to the California policies on free exercise grounds are likely to succeed on the merits.

The same is true for the subclass of parents who object to those policies on due process grounds. Under long-established precedent, parents—not the State—have primary authority with respect to "the upbringing and education of children." *Pierce* v. *Society of Sisters*, 268 U. S. 510, 534–535 (1925); accord, *Meyer* v. *Nebraska*, 262 U. S. 390, 399–400 (1923). The right protected by these precedents includes the right not to be shut out of participation in decisions regarding their children's mental health. *Parham* v.

*J. R.*, 442 U. S. 584, 602 (1979). Gender dysphoria is a condition that has an important bearing on a child's mental health, but when a child exhibits symptoms of gender dysphoria at school, California's policies conceal that information from parents and facilitate a degree of gender transitioning during school hours. These policies likely violate parents' rights to direct the upbringing and education of their children.

*Irreparable harm.* The denial of plaintiffs' constitutional rights during the potentially protracted appellate process constitutes irreparable harm. *Roman Catholic Diocese of Brooklyn* v. *Cuomo*, 592 U. S. 14, 19 (2020) (*per curiam*).

*Balance of equities.* Finally, the "equities do not justify depriving [the parents] of the District Court's judgment in their favor." *Alabama Assn. of Realtors*, 594 U. S., at 765. Everyone agrees that children's safety is the overriding equity. And the injunction here promotes child safety by guaranteeing fit parents a role in some of the most consequential decisions in their children's lives. The injunction also permits the State to shield children from unfit parents by enforcing child-abuse laws and removing children from parental custody in appropriate cases.

## III

The Ninth Circuit's procedural objections to the injunction are unlikely to prevail.

First, the parents protected by the injunction very likely have standing because they are objects of the challenged exclusion policies. See *Diamond Alternative Energy, LLC* v. *EPA*, 606 U. S. 100, 114 (2025). Contrary to the Ninth Circuit's suggestion, the injunction does not provide relief for all the parents of California public school students, but only for those parents who object to the challenged policies or seek religious exemptions.

Second, class certification was likely proper. The District Court addressed the requirements for certification under Rule 23 and explained why it concluded that they were met.

* * *

The application to vacate the Ninth Circuit's stay presented to JUSTICE KAGAN and by her referred to the Court is granted as to the parents but is otherwise denied.

JUSTICE THOMAS and JUSTICE ALITO would grant the application in full.

JUSTICE SOTOMAYOR would deny the application in full.

# SUPREME COURT OF THE UNITED STATES

No. 25A810

ELIZABETH MIRABELLI, ET AL. *v.* ROB BONTA, ATTORNEY GENERAL OF CALIFORNIA, ET AL.

ON APPLICATION TO VACATE INTERLOCUTORY STAY ORDER

[March 2, 2026]

JUSTICE BARRETT, with whom THE CHIEF JUSTICE and JUSTICE KAVANAUGH join, concurring.

As the dissent observes, substantive due process is a controversial doctrine. Judges typically interpret express constitutional rights, such as the freedom of speech or religion. But substantive due process asks us to find unexpressed rights in a constitutional provision that guarantees only "process" before a person is deprived of life, liberty, or property. U. S. Const., Amdt. 14, §1. When rights are unstated, how do judges know what they are? The obvious risk is that judges will use their own values as a guide, thereby jeopardizing the People's right to self-governance. To mitigate this risk, the Court has crafted a demanding test for recognizing unexpressed rights: They must be "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Washington* v. *Glucksberg*, 521 U. S. 702, 721 (1997) (internal quotation marks omitted). Relevant here, the doctrine of substantive due process has long embraced a parent's right to raise her child, which includes the right to participate in significant decisions about her child's mental health. See *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925); *Meyer* v. *Nebraska*, 262 U. S. 390 (1923); *Parham* v. *J. R.*, 442 U. S. 584 (1979).

The parent-applicants are likely to succeed on the merits under a straightforward application of these cases. California prohibits its public schools from informing parents of

their child's gender transition at school unless the child consents. The record in this case indicates that the State's nondisclosure policy applies even if parents expressly ask for information about their child's gender identification. One set of parents learned of their child's transition at school only after the child attempted suicide. Strikingly, even after this tragic event, school administrators continued to withhold information about the student's gender identification. California's nondisclosure policy thus quite obviously excludes parents from highly important decisions about their child's mental health, see *Parham*, 442 U. S., at 601–604, and is unlikely to satisfy heightened scrutiny. Our resolution of the parents' likelihood of success on this claim is dictated by existing law.

The dissent questions how the Court can adhere to parental-rights precedent after its decision in *Dobbs* v. *Jackson Women's Health Organization*, 597 U. S. 215 (2022). *Post*, at 5–6 (opinion of KAGAN, J.). But *Dobbs* calls into question neither the doctrine of substantive due process nor the other unexpressed rights that the doctrine protects. Applying *Glucksberg*, *Dobbs* holds that *Roe* v. *Wade*, 410 U. S. 113 (1973), and *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992), were incorrectly decided because a right to abortion is not "'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" *Dobbs*, 597 U. S., at 231. And because the Court concluded that the *stare decisis* factors counseled against retaining these cases, *Dobbs* overruled them. *Id.*, at 263–290. It does not follow from *Dobbs* that all our substantive due process cases conflict with *Glucksberg*, much less that *stare decisis* would counsel overruling any that do.

No party to this dispute questions the continued validity of *Meyer*, *Pierce*, or *Parham*. For all its concerns about deciding the issue in this posture, the dissent expresses "no doubt that parents have rights, even though

unenumerated, concerning their children and the life choices they make." *Post*, at 6. And the precedent recognizing those rights controls our assessment of whether the parents are likely to succeed on the merits.

The word "likely" is important, because it reflects that our assessment is preliminary. We consider the merits not to conclusively resolve them, but because they bear on the limited question before us: Are the parents entitled to the benefit of the judgment entered by the District Court while California tries to overturn that judgment on appeal? The Ninth Circuit—itself acting on an interim basis—said "no." We disagree. The parents must continue to litigate in the Ninth Circuit, and if necessary, this Court. But in the meantime, the injunction of California's policy—which, incidentally, *was* entered after a full merits process—remains in place.

And contrary to the dissent's charge, granting interim relief is not a sign of the Court's "impatience" to reach the merits. *Post*, at 2. Instead, the grant reflects the Court's judgment about the risk of irreparable harm to the parents. See *Nken* v. *Holder*, 556 U. S. 418, 435 (2009). If the parents were probably right but would suffer little harm from the Ninth Circuit's stay, they would not be entitled to interim relief. *Ibid.* But that is not the situation here. Under California's policy, parents will be excluded—perhaps for years—from participating in consequential decisions about their child's mental health and wellbeing. Thus, the parents are likely to suffer irreparable harm if California enforces its policy while this litigation winds its way through the courts. *Ante*, at 6.

One last point: The Court has chosen to accompany today's order with a *per curiam* opinion that explains its reasoning. The choice to say more rather than less is perhaps the source of the dissent's concern that our disposition of this application will be taken as a "conclusive merits judgment." *Post*, at 4. But see, *e.g.*, *Whole Woman's Health* v.

*Jackson*, 594 U. S. \_\_\_, \_\_\_ (2021) (KAGAN, J., dissenting from denial of application for injunctive relief) (slip op., at 1) (critiquing this Court's interim orders for "barely bother[ing] to explain [their] conclusion[s]"); *Trump* v. *Boyle*, 606 U. S. \_\_\_, \_\_\_ (2025) (KAGAN, J., dissenting from grant of application for stay) (slip op., at 3) (similar). Interim applications routinely require the Court to balance the lock-in risk of saying too much against the transparency cost of saying too little. See *Labrador* v. *Poe*, 601 U. S. \_\_\_, \_\_\_–\_\_\_ (2024) (KAVANAUGH, J., concurring in grant of stay) (slip op., at 11–12). In my judgment, the benefits of explanation win out here. The Ninth Circuit (following the Sixth Circuit) significantly misunderstood *Mahmoud* v. *Taylor*, 606 U. S. 522 (2025), and general course correction will allow the case to progress efficiently. And because of the *Dobbs* point that JUSTICE KAGAN raises, it would have been unwise to issue an unreasoned order on the parents' substantive due process claim.

When an interim application comes to us, "we must decide it—grant or deny." *Labrador,* 601 U. S., at \_\_\_ (KAVANAUGH, J., concurring in grant of stay) (slip op., at 2). Because the *Nken* factors strongly favor the parents, *ante*, at 4–6, I see no basis for denying this application.

SUPREME COURT OF THE UNITED STATES
_____

No. 25A810
_____

ELIZABETH MIRABELLI, ET AL. *v.* ROB BONTA, ATTORNEY GENERAL OF CALIFORNIA, ET AL.

ON APPLICATION TO VACATE INTERLOCUTORY STAY ORDER

[March 2, 2026]

JUSTICE KAGAN, with whom JUSTICE JACKSON joins, dissenting.

Today's decision shows, not for the first time, how our emergency docket can malfunction. A case raising novel legal questions and arousing strong views comes to this Court via an application about whether to stay a district court's injunction pending appeal. The ordinary appellate process has barely started; only a district court has ruled on the case's merits. The Court receives scant and, frankly, inadequate briefing about the legal issues in dispute. It does not hold oral argument or deliberate in conference, as regular procedures dictate. It considers the request on a short fuse—a matter of weeks. And then the Court grants relief by means of a terse, tonally dismissive ruling designed to conclusively resolve the dispute. The Court does all this even though the application of existing law to the case raises tricky questions, and so cries out for reflection and explanation. The Court is impatient: It already knows what it thinks, and insists on getting everything over quickly. See also, *e.g.*, *Department of State* v. *AIDS Vaccine Advocacy Coalition*, 606 U. S. \_\_\_, \_\_\_ (2025) (KAGAN, J., dissenting from grant of stay application) (slip op., at 2–3); *Trump* v. *Wilcox*, 605 U. S. \_\_\_, \_\_\_ (2025) (KAGAN, J., dissenting from grant of stay application) (slip op., at 2–3, 8).

Indeed, the precipitousness of the Court's decision today has yet a further—and wholly new—dimension: In granting

emergency relief, the Court cannot even wait for an appellate court to conclude its own process for deciding the identical issue.  As the Court notes, a Ninth Circuit panel last month stayed the District Court's injunction against the challenged policies, pending the State's appeal of that order.  See *ante*, at 3–4.  The plaintiffs responded by simultaneously filing two motions—one asking this Court to vacate the panel's stay and the other asking the Ninth Circuit to do the same thing through en banc review.  The Ninth Circuit is already acting on the motion filed there: The court promptly called for (and has now received) a response from the State, preparatory to exchanging memoranda and voting on reconsideration of the panel's decision.  Regular order counsels that, in this situation, the Ninth Circuit should go first.  The lower court, that is, should decide whether to vacate the stay; and only then should this Court decide whether further action is needed.  Cf. Supreme Court Rule 23.3 (Stay applications "shall set out with particularity why the relief sought is not available from any other court").  But the Court's impatience cannot be contained for even that long.  The Court jumps the line, pre-empting the Ninth Circuit's normal (and notably reflective) en banc process.  Why wait for appellate procedures to play out when the Court already knows what it wants?

   And still, there is worse: The Court resolves the issues raised through shortcut procedures on the emergency docket even though it has had—for months now—the option of doing so the regular way, on our merits docket.  Since November of last year, a petition for certiorari has been pending in a case that, in critical respects, is a carbon copy of this one.  In *Foote* v. *Ludlow School Comm.*, 128 F. 4th 336 (CA1 2025) (*per curiam*), cert. pending, No. 25–77, as here, a public school adopted a policy, conforming to a state agency's guidance, about students who identify as transgender.  There, as here, the policy requires school employees to use only a student's preferred name and

pronouns, while barring employees from disclosing the student's at-school gender identity to parents. And there, as here, parents challenge that policy as a violation of their right to substantive due process. See *id.*, at 340–344.[1] Why not, then, just grant certiorari in *Foote*, and decide it this coming fall? Or if there is some reason that *Foote* is not suitable, the Court could take one of the many cases lined up behind it. By recent count, almost 40 cases raising due process and/or free exercise objections to similar school policies are currently in the judicial system (with several recently decided by appellate courts), so this Court would not have to wait long. See Pet. for Cert. in *Foote*, O. T. 2025, No. 25–77, p. 32. By granting certiorari on one (or more) of those cases, the Court could ensure that the issues raised by such policies receive the careful, disciplined consideration they merit, rather than the inevitably truncated review the Court affords emergency applications.

Certainly, the Court cannot claim that thought and care are not needed. If nothing else, this Court owes it to a sovereign State to avoid throwing over its policies in a slapdash way, if the Court can provide normal procedures. And throwing over a State's policy is what the Court does today. To be sure, the Court sprinkles the word "likely" atop its assessment of which party's arguments will succeed. But no one—in particular, neither a state official nor a lower

---

[1] The one difference between this case and *Foote* is that this case also involves a First Amendment free exercise claim, which would (if successful) give relief to parents with religious objections to the State's policy. But as addressed later, the Court's recognition of the substantive due process claim here makes the free exercise claim immaterial. See *infra*, at 4. That is because accepting the due process claim gives relief to *all* objecting parents, religious and non-religious alike. So granting certiorari in *Foote* would allow the Court to consider, on its regular merits docket, the only claim doing actual work here. And if it is nonetheless thought important to address the First Amendment issue as well, the Court could grant certiorari (as I next explain) on one of multiple other cases raising both issues that are likely to reach us in short order.

court—is apt to read the Court's *per curiam*, brusque though it is, as anything less than a conclusive merits judgment.

In any event, there *is* something else: This case presents some thorny legal issues. The Court grants relief to parents on the same two substantive grounds that supported the District Court's injunction. First, the Court says, some parents can show that the State's policy "substantially interfere[s]" with their First Amendment right "to guide the religious development of their children." *Ante*, at 5. Here, the Court analogizes to *Mahmoud* v. *Taylor*, 606 U. S. 522 (2025), a decision issued last Term about school curriculum. The ink on that decision is barely dry, and courts have just begun to consider its meaning and reach. But even assume the Court is right on the free exercise score; still, that could not justify extending relief to *all* the parents here. After all, some of those parents object to the State's policy not for religious reasons, but simply because it prevents them from taking part in their children's most crucial life decisions. So the District Court also ruled on substantive due process grounds, finding a parental right to "direct the upbringing and medical care of their children." App. to Emergency Application 54a. And indeed, in doing so, the court made its free exercise ruling superfluous, because the due process ground protects every parent, whether or not religious. See *supra*, at 3, n. 1. This Court, to affirm the relief given, must follow the same course: It explains that the State's policy "excludes parents" from "participation in decisions regarding their children's mental health." *Ante*, at 5–6. But the very phrasing the Court uses betrays the delicateness of the operation: Even in recognizing that parental right, the Court cannot quite bring itself to name the legal doctrine— it is, again, substantive due process—that provides the right's only basis.

Anyone remotely familiar with recent debates in constitutional law will understand why: Substantive due process

has not been of late in the good graces of this Court—and especially of the Members of today's majority. The Due Process Clause, needless to say, does not expressly grant parental rights of any kind. The relevant text bars a State only from depriving a person of "liberty" "without due process of law." Members of the majority often have expressed skepticism—sometimes outright hostility—to understanding the "capacious" term "liberty" to enshrine specific rights. *Dobbs* v. *Jackson Women's Health Organization*, 597 U. S. 215, 239 (2022). Substantive due process, one has stated, is a "particularly dangerous" "legal fiction" because it "invites judges" to "roa[m] at large in the constitutional field guided only by their personal views." *McDonald* v. *Chicago*, 561 U. S. 742, 811 (2010) (THOMAS, J., concurring in part and concurring in judgment); *Obergefell* v. *Hodges*, 576 U. S. 644, 721 (2015) (THOMAS, J., dissenting).[2] Another has pointed to the "judicial misuse of the so-called 'substantive component' of due process to dictate policy on matters that belonged to the people to decide." *Sessions* v. *Dimaya*, 584 U. S. 148, 191 (2018) (GORSUCH, J., concurring in part and concurring in judgment). And yet a third, when defending the Court's elimination of a 50-year-old right grounded in substantive due process, explained that the "Constitution does not grant the nine unelected Members of this Court the unilateral authority to rewrite the Constitution." *Dobbs*, 597 U. S., at 340 (KAVANAUGH, J., concurring). There are many such statements to choose from in this Court's recent substantive due process caselaw. Especially given the Court's last venture into the field, today's

―――――――
[2] For that reason, JUSTICE THOMAS has called for overruling "all" of this Court's "substantive due process precedents." *Dobbs*, 597 U. S., at 332–333 (concurring opinion). That invitation presumably extends to the precedents supporting both the District Court's decision and today's *per curiam*. See *ante*, at 5–6 (citing *Meyer* v. *Nebraska*, 262 U. S. 390 (1923); *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925); and *Parham* v. *J. R.*, 442 U. S. 584 (1979)); App. to Emergency Application 38a–39a.

decision cannot but induce a strong sense of whiplash. Compare *ante*, at 5–6 (recognizing a parent's right to make important decisions about her child's health), with *Dobbs*, 597 U. S., at 231 (repudiating a woman's right to make important decisions about her own health).[3]

   None of this is to say that the Court gets the merits here wrong. It may not—as to the plaintiffs' free exercise claim, or their substantive due process claim, or both. As to due process particularly—because, again, that claim alone does all the load-bearing work in this case, see *supra*, at 3, n. 1, 4—I have no doubt that parents have rights, even though unenumerated, concerning their children and the life choices they make. See *Pierce* v. *Society of Sisters*, 268 U. S. 510, 534–535 (1925); *Parham* v. *J. R.*, 442 U. S. 584, 602–603 (1979). On the other side of ledger, of course, a State has critical interests in the care and education of children. But California's policy, in depriving all parents of information critical to their children's health and well-being, could have crossed the constitutional line. And that would entitle the parents, at the end of the day, to relief.

   The Court, however, would be far better equipped to draw the appropriate line and to explain its legal basis—in short, to do law in the right way—if it had followed our

---

   [3] Another contrast—this time, between this case and *United States* v. *Skrmetti*, 605 U. S. 495 (2025)—is also striking. In *Skrmetti*, several parents challenged Tennessee's ban on gender-affirming care for minors. The suit raised claims grounded in both equal protection and substantive due process. As to the latter, the parents in *Skrmetti*, similarly to the parents here, asserted a right "to make decisions concerning medical care for their minor children." Pet. for Cert., O. T. 2023, No. 23–466, p. 34; see *id.*, at 18 (invoking a "right of parents with respect to the care, custody, and control of their children, including in decisions about medical care"). And in support of that right, the *Skrmetti* parents relied on the same precedents the Court does today: *Parham*, 442 U. S. 584, and *Pierce*, 268 U. S. 510. See Pet. for Cert., No. 23–466, at 34–36; *ante*, at 5–6. But the Court, when deciding to grant certiorari in *Skrmetti*, limited its review to the equal protection issue: It would not even hear the parents out on their substantive due process claim.

ordinary processes. A mere decade ago, this Court would never have granted relief in this posture. (Indeed, I am confident that the plaintiffs would never have thought to ask, at this stage, for the Court's involvement.) Then, though apparently not now, we understood that our normal processes—full briefing, oral argument, conference, and opinion writing, along with the time they take—exist for a reason. They ensure that before the Court makes a decision, it has marshaled all the relevant facts; considered all interested parties' and multiple lower courts' legal arguments; and deliberated internally, with full understanding of each other's perspectives, on all disputed issues. So too, those processes enable us to think through the best legal rationale for, and scope of, any decision, given both the views we have earlier expressed and the related issues that will soon come before us. And they allow us to explain ourselves well and carefully, both to the parties and to the public. Our processes are, in short, the hallmark of judicial probity, and alike its guarantor. There was no reason to abandon them here. I respectfully dissent.